821 So.2d 508 (2002)
Linda HANLEY, Plaintiff-Appellee
v.
DOCTORS HOSPITAL OF SHREVEPORT, Defendant-Appellant.
No. 35,527-CA.
Court of Appeal of Louisiana, Second Circuit.
June 6, 2002.
Rehearing Denied August 8, 2002.
*513 Julia A. Mann, Penny N. Nowell, Shreveport, for Appellant.
Laurie W. Lyons, Henry C. Walker, Shreveport, for Appellee.
Before WILLIAMS, STEWART and CARAWAY, JJ.
WILLIAMS, Judge.
The defendant, Doctors Hospital of Shreveport ("Doctors Hospital"), appeals a judgment in favor of the plaintiff, Linda Hanley ("Hanley"). For plaintiff's sexual harassment claim, the jury awarded $100,000 in lost wages, $100,000 for emotional distress and $300,000 in punitive damages. The award for the retaliation claim included $80,000 for emotional distress and $500,000 in punitive damages. Pursuant to the statutory damages cap in 42 U.S.C. § 1981a, the judgment reduced the total award to $579,900 and awarded plaintiff $127,966 in attorney fees. For the following reasons, we amend and affirm as amended.

FACTS
In August 1993, Hanley, a registered nurse (RN), began working at Doctors Hospital through a nurse staffing agency. Hanley was hired directly by the Hospital in August 1994 for a full-time position in the intensive care unit (ICU). Shortly after Hanley began working at the hospital, *514 another nurse, Mike Paxton, RN, was assigned to work with her in the same unit on the late shift.
According to Hanley, within the first month of working together, Paxton began to sexually harass her with offensive sexual jokes and comments. Hanley initially tried to ignore the conduct, but Paxton's harassment eventually escalated and became more overt and aggressive. Paxton repeatedly made sexual comments, suggesting that Hanley engage in sex with him and another nurse, referred to as a "threesome," and requesting that she perform oral sex. Paxton also physically touched Hanley's breasts and buttocks on several occasions. Hanley rejected his advances and demanded that he cease the harassment, but without result.
In August 1995, Hanley complained about Paxton's behavior to her supervisor and a meeting was held to discuss her concerns. The participants included Hanley, her supervisor, Pam Shelton, the director of nurses, Jackie Nettles and the human resources director, Gail Modisette. According to Hanley, at the meeting she asked that hospital management speak to Paxton and warn him to leave other employees alone, but was told this could not be done unless she filed a "formal" complaint. Hanley stated that she wanted her concerns about Paxton to be kept confidential because Shelton was unwilling to assure her that she would not be required to work alone with him during the overnight shift in the ICU.
After a two or three week period when Hanley and Paxton did not work together, Hanley was again scheduled to work alone with Paxton on the late shift. Hanley stated that a short time later, she informed Shelton that she wanted to file a formal complaint against Paxton and tried several times to arrange a meeting, but the supervisor said she was too busy and that they would talk later. Hanley also contacted Modisette and was told to make an appointment, but Hanley did not make the attempt.
Hanley began to believe that the hospital was retaliating against her because she had complained about Paxton's conduct. Her work seemed to be more closely scrutinized than that of other nurses. Hanley felt she was disparately disciplined for minor infractions, because the head nurse openly criticized Hanley for tardiness several times in front of her co-workers.
According to the hospital, the supervisors who met with Hanley in August 1995 felt their hands were tied because she did not provide specific information with which an investigation could be conducted. The hospital's administrator, Charles Boyd, stated that he met privately with Paxton and informed him that Hanley had accused him of sexual harassment. Boyd said he told Paxton that if a formal complaint was made, there would be a full investigation and that if any of Hanley's allegations were true, he needed to cease and desist. In January 1996, Hanley was assigned to work days and no longer worked with Paxton.
The hospital alleges that while working on the dates of February 11 and 13, 1996, Hanley committed five serious nursing errors, including improperly allowing air in an IV line before she was stopped by another nurse, setting an IV pump rate at a higher level than ordered, failing to have the removal of narcotics witnessed, writing the incorrect medication dosage and failing to transfer a verbal order to a patient's chart. Hanley then missed two weeks of work due to illness. On February 26, 1996, Hanley was terminated by the hospital for the alleged nursing errors.
Subsequently, the plaintiff, Hanley, filed a petition for damages against the defendant, *515 Doctors Hospital, alleging sexual harassment and retaliation. After filing suit, the plaintiff died of unrelated causes in April 2000. Pamela Raspberry, the administratrix of Hanley's succession, was substituted as party plaintiff. After a trial, the jury found that defendant was liable for sexual harassment and awarded plaintiff $100,000 in lost wages, $100,000 for emotional distress and $300,000 in punitive damages. Regarding the retaliation claim, the jury awarded $80,000 for emotional distress and $500,000 in punitive damages. Hanley's total award was $1,080,000.
Applying the damages cap provided in 42 U.S.C. § 1981a, the trial court rendered judgment awarding the succession of Hanley $579,900, consisting of the following amounts:

Emotional pain and suffering-plaintiff's $100,000
 state law sexual harassment claim
Lost wages and benefits-plaintiff's $100,000
 retaliation claim under state and
 federal law
Emotional pain and suffering-plaintiff's $ 79,900
 state law retaliation claim
Emotional pain and suffering-plaintiff's $ 100
 federal sexual harassment and
 retaliation claims
Punitive damages-plaintiff's federal $299,900
 sexual harassment and retaliation
 claims

The trial court also awarded attorney fees and costs of $127,966.49. Thus, the plaintiff's estate was awarded the total sum of $707,866.49. The defendant appeals the judgment.

DISCUSSION
The defendant contends the evidence was insufficient to support the jury's finding that sexual harassment occurred. Defendant argues that the plaintiff failed to show that hospital personnel knew or should have known of the harassment because her initial allegations were vague and she did not notify the hospital that Paxton had resumed harassing her after a period without incident following the August 1995 meeting.
LSA-R.S. 23:1006 prohibits intentional discrimination on the basis of race, color, religion, sex or national origin. Louisiana's anti-discrimination law is similar in scope to the federal statute prohibiting discrimination based on sex found in Title VII of the Civil Rights Act of 1964, at 42 U.S.C. § 2000e. Lebeaux v. Newman Ford, Inc., 28,609 (La.App.2d Cir.9/25/96), 680 So.2d 1291.
A plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment. Alphonse v. Omni Hotel Management Corp., 94-0157 (La.App. 4th Cir.9/29/94), 643 So.2d 836. To satisfy the burden of proof under Title VII, the plaintiff was required to prove that: (1) she belonged to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on gender; (4) the harassment affected a term or condition of employment; and (5) the employer knew or should have known about the harassment and failed to take prompt remedial action. Waltman v. International Paper Co., 875 F.2d 468 (5th Cir.1989); Lebeaux, supra.
In the present case, Ginger James, an RN and long-time employee of defendant, testified that Hanley told her that Paxton had acted inappropriately by approaching her from behind and pressing his body against her body. James stated that she informed Nettles and Shelton of Hanley's complaint about Paxton's improper sexual touching.
Kerri Stevens, a licensed practical nurse who sometimes worked in the ICU, testified that she personally observed Paxton *516 grab Hanley's buttocks as she walked past him while they were working. Stevens stated that she informed Shelton that Paxton had been fired from another hospital due to sexual harassment and that she had witnessed him perform the same behavior toward Hanley. Although Stevens did not remember the specifics of their conversation, she believed she told Shelton enough to make her aware that Paxton's conduct was sexual harassment.
Stevens also testified that Paxton remarked about Hanley's appearance and said that the shape of her mouth meant she would be able to perform oral sex. Stevens acknowledged that she had been terminated by defendant after being disciplined on two occasions for improper documentation of narcotics.
Gail Modisette, the defendant's human resources director, testified that she knew Hanley had complained about Paxton's inappropriate sexual behavior. Modisette told Shelton and Nettles to meet with Hanley and review the sexual harassment policy, to ask her for specific incidents and for the names of any witnesses. Modisette stated that employees were given a copy of the policy when hired, but that it was not posted in the hospital. Modisette testified that defendant did not provide training to assist employees in recognizing sexual harassment and that she was not aware of any training for department heads in responding to such complaints. Modisette acknowledged that she did not question Paxton about his conduct after Hanley's complaint and did not discuss defendant's sexual harassment policy with employees as a group.
Pamela Shelton, the assistant director of nurses at the time of Hanley's employment, testified that she and Jackie Nettles met with Hanley in August 1995 to discuss her concern about Paxton's conduct. Shelton stated that Hanley complained that she was having a problem with sexual harassment by Paxton, but she did not provide any specifics about his behavior. Shelton asserted that Hanley did not want any action taken, but only wanted hospital administrators to be aware of the situation in case anyone else complained about Paxton's behavior.
Shelton testified that after the meeting, her hand-written notes were typed and then signed by Nettles and herself as documentation of the meeting. Shelton acknowledged that she did not give Hanley a copy of the notes and did not allow her to read or sign the document to indicate whether she agreed with the contents. Shelton stated that she later telephoned Hanley at the ICU as a follow-up to the meeting and Hanley told Shelton that she was not having any further difficulty. However, Shelton did not document this action in writing.
Shelton testified that she advised Hanley not to talk to other employees about the situation, out of concern for Paxton's privacy, and told her that the hospital could not take any action because there was only her word about his conduct. However, Shelton acknowledged that she was personally aware that Paxton had previously told "off-color" jokes at work. Shelton denied saying on three occasions that she was too busy to meet with Hanley and discuss Paxton, asserting that such events "never happened."
In her deposition, Hanley testified that in Summer 1995, she told Ginger James that Paxton's inappropriate touching of her body and sexual jokes were interfering with her ability to work. In August 1995, Hanley attended a meeting with Shelton, Nettles and Modisette and told them that Paxton was touching her in a sexual manner, making sexual remarks and that his behavior was offensive and inappropriate. Hanley acknowledged that she "generalized" *517 about Paxton's behavior at the meeting because she was very uncomfortable talking about the subject. Hanley stated that during the meeting, she felt that her concerns were not taken seriously and that Shelton did not believe her complaints.
Hanley testified that Paxton commented on her breasts and buttocks almost every time they worked together and suggested that she participate in a sexual "threesome." Hanley stated that Paxton had grabbed her buttocks several times, that on more than two occasions, Paxton approached her from behind and pressed his body against hers and that he had followed her into the women's restroom. Hanley testified that for a brief period of two to three weeks after the August meeting there were not any incidents because she did not work with Paxton during that time. However, when they were again scheduled to work together, Paxton resumed his offensive touching and improper sexual comments.
In his testimony, Paxton denied touching Hanley in a sexual manner and asserted that while working together, he and Hanley had participated in "flirtatious conversations." Paxton testified that neither Nettles nor Modisette had given him a warning that his behavior was inappropriate.
Charles Boyd, the hospital administrator, testified that after receiving reports from Hanley's supervisors, he met with Paxton. Boyd stated that he informed Paxton that Hanley had alleged he was sexually harassing her, but accepted Paxton's denial of such behavior. Boyd did not meet with Hanley.
Based on the foregoing testimony, the jury could reasonably have found that Hanley produced sufficient evidence demonstrating that Paxton had touched her in a sexual manner and directed sexual comments toward her and that defendant had received notice of Paxton's harassment from the reports of Hanley and another nurse. Consequently, we conclude that the evidence presented supports the jury's finding that Hanley was subjected to sexual harassment affecting conditions of her employment and that defendant knew or should have known about the harassment, but failed to take prompt remedial action. The assignment of error lacks merit.

Prescription
The defendant contends the trial court erred in finding that plaintiff's claims had not prescribed. Defendant argues that the alleged sexual harassment would have ended by February 13, 1996, so that plaintiff's suit filed on February 24, 1997, was untimely.
When the plaintiff alleges a continuing course of harassing conduct, the defendant pleading prescription has the burden of proving the facts necessary to sustain the plea. Bustamento v. Tucker, 607 So.2d 532 (La.1992). When the conduct and resulting damages continue over time, the prescriptive period does not commence until the last act occurs or the conduct causing the damage is abated. Waltman v. International Paper Co., 875 F.2d 468 (5th Cir.1989). Prescriptive statutes are to be strictly construed. Bustamento, supra.
In the present case, Hanley testified that on several occasions, Paxton telephoned her from other job sites while she was working, even though she had previously told him not to call. Hanley stated that these contacts were unwelcome, offensive and upsetting to her. The testimony indicates that because of Paxton's prior acts of harassment, the prospect that Paxton would continue to contact her caused Hanley anxiety and stress even when they were not working together. Thus, the trial court could reasonably find *518 that a hostile environment existed and continued to cause harm to Hanley up until the point she was terminated on February 26, 1996. Consequently, we cannot say the trial court erred in concluding that Hanley's claims had not prescribed when suit was filed on February 24, 1997. The assignment of error lacks merit.

Evidentiary Issues
The defendant contends the trial court erred in admitting evidence of errors committed by other nurses who did not work in the ICU or who worked at times before or after Hanley's period of employment. Defendant argues that such evidence confused the jury and should have been excluded.
All relevant evidence is admissible unless otherwise provided by law. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. LSA-C.E. arts. 401-403. Generally, the trial court is accorded discretion concerning the admission or exclusion of evidence. A trial court's decision to admit or exclude evidence will not be reversed absent an abuse of discretion. Dixon v. Winn-Dixie Louisiana, Inc., 93-1627 (La.App. 4th Cir.5/17/94), 638 So.2d 306.
In the present case, Ginger James testified about errors made by other nurses at Doctors Hospital, including Val Anderson, Joyce Clements, Karen Noble, Royette Trotta, Cora Rose and Elaine Mack. All except Anderson and Trotta were RNs. Clements, Noble and Trotta worked in the ICU. At trial, defendant renewed its objection to testimony about nursing errors made by others after Hanley's termination and following the hospital's internal policy change concerning documentation of errors. The trial court stated that defendant's objection went to the weight of the evidence and that the testimony was admissible to give Hanley the opportunity to prove retaliatory discharge by showing that other nurses made similar mistakes but were treated differently.
The testimony indicated that despite any change in the documentation procedure in 1998, the same type of errors were considered "serious" both during Hanley's employment and afterward. In addition, the evidence showed that the types of errors committed, such as sleeping on the job or giving the wrong medication, could be compared between different departments of the hospital. Defendant was able to address those factors which it believed indicated that the other nurses discussed were not similarly situated to Hanley. The jury was able to evaluate the extent to which Hanley was treated differently. Based upon this record, we cannot say the trial court abused its discretion in admitting the evidence. The assignment of error lacks merit.
The defendant contends the trial court erred in denying defendant's motion to exclude testimony about a "late entry" on an emergency room patient's chart by RN Kurt Hartman. A trial judge's assessment of the probative value of evidence is afforded great weight. Green v. Claiborne Electric Co-op., 28,408 (La.App.2d Cir.6/26/96), 677 So.2d 635.
Here, Deborah Weeks testified that while working as a nurse at Doctor's Hospital, she discovered that Hartman had failed to record a patient's vital signs during his shift. Weeks stated that some time later Hartman had written in the vital signs without designating the information as a late entry, an act which could be considered as falsifying medical records. This error was discovered approximately one year later while Hanley was working *519 at the hospital. Hartman was not counseled or disciplined in any way.
Defendant argues the testimony should have been excluded because Hartman, who worked in the emergency room, was not a comparable nurse to Hanley, there was an explanation for his act and the evidence gave the jury an unfair image of defendant. However, the jury was able to weigh Hartman's status as an ER nurse and the explanation provided for his conduct when considering the evidence.
Defendant also asserts that the trial court denied the motion despite finding that the prejudicial effect of this testimony would outweigh its probative value. As defendant points out, the trial transcript quotes the court as stating: "I think it is an appropriate line of inquiry. I think the prejudicial effect would outweigh the probative value. I think probative value is present, and the motion in limine will be denied." In light of the trial judge's comments and ruling, the defendant's assertion that the court found the testimony overly prejudicial is not reasonable in the context of the proceedings. We cannot say the trial court abused its discretion in denying the motion.
In two assignments of error, the defendant contends the trial court erred in excluding the testimony of Sherlynne Wright, Natalie Callahan and James Ferris. Defendant argues that Wright's testimony concerning a telephone call to plaintiff by her supervisor, Pam Shelton, should have been admitted to impeach plaintiff's contention that no one at the hospital followed up on her situation after the August 1995 meeting. The court found that Wright's proposed testimony was not reliable, since Wright did not recall the exact words spoken by Hanley and the testimony was based on partial statements Wright overheard two years previously in response to an unknown question. We cannot say the trial court abused its discretion in excluding the evidence.
Defendant argues that Ferris would have testified that Hanley made errors at Bossier Medical Center after she was fired by defendant and that the testimony should have been admitted to rebut her contention that retaliation was the actual motive for her termination. In his deposition, Ferris testified only that Hanley was on the list not to call back for work and that she "probably" made a medication error, but that he did not specifically remember. Thus, Ferris did not demonstrate personal knowledge of nursing errors by Hanley and the court's exclusion of the testimony was not an abuse of discretion.
Contrary to defendant's contention in its brief, the record does not show that the court refused to allow defendant to present Callahan's testimony. In a pretrial hearing, the court deferred a decision regarding Callahan to a later time. However, the defendant did not subsequently seek a ruling by the court or call Callahan as a witness. Thus, the issue is moot. The assignments of error lack merit.

Retaliation
The defendant contends the evidence does not support the jury's finding that Hanley was terminated in retaliation for her complaint about sexual harassment. To establish a prima facie case for retaliation, the plaintiff must prove by a preponderance of the evidence that: (1) she engaged in an activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse employment action. Long v. Eastfield College, 88 F.3d 300 (5th Cir.1996). Once the plaintiff establishes a prima facie case, the burden of production shifts to *520 defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action. Long, supra.
If the defendant introduces evidence which, if true, would permit the conclusion that the adverse action was non-discriminatory, the employee assumes the burden of proving that the reasons given were a pretext for retaliation. The plaintiff must show that "but for" the protected activity, the termination would not have occurred. McMillan v. Rust College, Inc., 710 F.2d 1112 (5th Cir.1983).
In the present case, Hanley demonstrated that she engaged in a protected activity and experienced an adverse employment decision. In order to establish a causal link between her termination and the protected activity, Hanley introduced evidence showing that other hospital employees committed similar or more serious nursing errors as those for which she was purportedly terminated, but were not disciplined in the same manner. The testimony showed that when a nurse made an error, the supervisor could issue a verbal or written counseling, which was documented by an "exceptional memo" placed in the nurse's personnel file.
Hanley testified that when she complained about Paxton's sexual harassment in August 1995, Shelton and Nettles were not supportive, since Shelton expressed her belief that Hanley was overreacting and they said that no action would be taken if she did not make a "formal" complaint. Hanley stated that after the meeting, she felt that the head nurse, Bill Chreene, gave her work special scrutiny and criticized her for tardiness more severely than other nurses who were late. The evidence shows that Hanley was not counseled about or given a chance to explain her February 1996 errors prior to her termination, which occurred approximately six months after her complaint of sexual harassment. Based on this record, the jury could have found sufficient evidence to establish, for the purposes of a prima facie case, a causal link between Hanley's protected activity and her termination.
Thus, the burden shifted to defendant to articulate a non-discriminatory reason for terminating Hanley. The defendant presented testimony by Shelton that Hanley was fired because of a series of "potentially serious" errors in the ICU, including the use of an IV line containing air, the failure to write down a doctor's verbal order and setting an IV rate at a speed higher than ordered. Shelton testified that she felt there would be patient injury as a result of Hanley's errors and that termination was warranted.
Jo Anne Molnar, the hospital risk manager, testified that Hanley's most serious error was setting the IV fluid rate too high and then leaving, so that the IV bag ran empty, causing a situation that could have been dangerous for the patient. Molnar stated that although the patients were not harmed, Hanley made an unusual number of errors in a brief time period.
Linda Dessommes, an RN accepted as a nursing expert, testified that she reviewed the termination memo and that Hanley's errors on February 11 and 13, 1996, potentially posed a threat to patients. Dessommes opined that Hanley's termination was appropriate at the time and was consistent with defendant's procedure that in serious situations progressive discipline was not required. Based on the foregoing testimony, the defendant met its burden by offering admissible evidence sufficient for the trier of fact to conclude that Hanley was fired after committing a number of nursing errors within a two-day period. Thus, Hanley bore the burden of *521 proving that but for the protected activity, she would not have been fired.
The evidence shows that in Hanley's initial three-month evaluation, she met expectations for the job, except for tardiness when she did not have her own vehicle. In December 1994, Hanley received written counseling for problems at work when she was seen visibly shaking and crying, her blood pressure was elevated and she was unable to function. Two days later, a nurse reported that "something was wrong" with Hanley, who thought the problem was a reaction to a change in medication. Hanley was assigned to work with another nurse for a two-week evaluation period, which she completed satisfactorily. Hanley's annual evaluation, signed by Chreene on August 31, 1995, listed scores of one in all areas, indicating that her performance met the requirements of the job.
In October 1995, two months after her complaint, Hanley was counseled for reporting to work two hours late and for incorrectly transcribing the medication dosage ordered by a physician. In November 1995 and December 1995, exceptional memos were issued to Hanley when she made arrangements to change her work schedule without contacting the nursing supervisor.
In February 1996, the termination memo listed five separate errors allegedly made by Hanley some time during February 11 and 13, 1996, but did not identify the specific date of each error. The memo stated that Hanley was flushing an IV line containing air and was "stopped by co-worker before total amount of air given to patient...." However, the testimony indicated that Hanley was working to clear the line of air and she did not actually inject any air into the patient.
The memo reported that Hanley failed to write down a physician's verbal order to delay a transfusion, failed to sign the log after obtaining a narcotic, set the IV fluid rate at a higher level than ordered and did not give a prescribed medication. The testimony showed that Hanley believed another nurse had agreed to write the verbal order and that although the IV bag was emptied, the IV had been running for approximately seven hours before the rate was increased and the patient had requested more relief. The memo was signed by Nettles and Shelton, who concluded that Hanley's performance was "unacceptable" and required termination.
James testified that normally she spoke with a nurse accused of errors prior to any discipline, but that Hanley was not counseled about any of the incidents in the final memo. James acknowledged that although Hanley had made several errors in one day, she had not compromised the health of any patient. In contrast to the discipline applied to Hanley, the jury heard evidence about Karen Noble, an RN who worked in the ICU before, during and after Hanley's period of employment.
In May 1992, Noble failed to properly respond to a patient's cardiac arrest. In the exceptional memo, Nettles wrote that this was "a critical offense and unacceptable behavior" for an RN in the ICU. Noble was not terminated, but suspended for one day. In November 1994, when Hanley was also employed by defendant, Noble twice gave a patient medication without a doctor's order. Although this behavior was called "unacceptable," Noble was merely given a warning that another such incident could result in termination. Noble was still employed by defendant at the time of trial.
The jury heard testimony that in February 1996, the month of Hanley's termination, the central line in a patient's jugular vein was pulled out while Katherine *522 Behan, an ICU nurse, was turning the patient, who began to bleed profusely. Because the nurse could not re-insert the central line, a doctor had to be called in. Despite committing this serious error, which placed the patient at risk for infection, Behan was not counseled or disciplined in any manner.
The evidence also demonstrated that Clements, an RN who worked in the ICU, committed a series of errors over an extended period of time. In February 1998, she was counseled for sleeping on duty and in May 1998, she failed to record a patient's vital signs. In July 1998, Clements missed giving medication to a patient for three consecutive days. In September and October 1998, she again failed to give prescribed medication to patients. After each of these errors, the supervisor counseled Clements, who continued to work. In November 1998, Clements was placed on three-months probation during which her work was monitored.
The defendant contends the multiple errors committed by Hanley over two days are not comparable to the series of errors made over a longer time period by other nurses. However, the jury could reasonably have concluded that the several errors made by Hanley were not more detrimental to patient care than another nurse's error of pulling the central line from a patient's neck, giving a patient the wrong medication or giving medicine which was not prescribed by a physician. Thus, the evidence supports a finding that Hanley was disciplined in a much different manner than the previously discussed nurses, who were given numerous chances to improve their performance. In contrast, Hanley was not given a chance to improve or even to explain the circumstances of the listed errors, as neither Shelton, Nettles nor James spoke to Hanley prior to the decision to terminate.
The factfinder's disbelief of the reasons asserted by defendant may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the jury to infer the fact of retaliation. Reeves v. Sanderson Plumbing Products Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Here, Shelton testified that Hanley's termination was necessary because of several "potentially serious" errors and the fear that there "would be" patient injury. The testimony demonstrated that this preemptive approach was quite different from the discipline applied to other nurses whose performance was labeled "unacceptable," and who actually injured patients, but who were not terminated because of their errors. In addition, when asked why Hanley had been disciplined concerning errors for which other nurses generally were not counseled, James testified that it appeared that when Nettles and Shelton compiled the list of Hanley's errors, "they were trying to stress the severity of the mistakes she was making." This statement, along with the evidence of disparate treatment of Hanley and her prior satisfactory performance evaluation could support a jury's finding that the employer intentionally discriminated against Hanley.
The jury heard the conflicting testimony and evaluated the parties' competing theories of the meaning of the evidence. After reviewing the record and applying the manifest error standard of review, we cannot say that the jury was clearly wrong in finding that the reasons offered by defendant for firing Hanley were pretexts for unlawful retaliation and that Hanley would not have been terminated but for her sexual harassment complaint. The assignment of error lacks merit.

Jury Instructions
The defendant contends the trial court erred in instructing the jury on the *523 duty to mitigate damages. Defendant argues that the jury's excessive back pay award resulted from the court's incorrect statement of law.
After presentation of all the evidence and arguments at trial, the court shall instruct the jurors on the law applicable to the cause submitted to them. LSA-C.C.P. art. 1792. Adequate jury instructions are those which provide the correct principles of law for the jury to apply to those issues reasonably raised by the pleadings and evidence. The trial court is not required to give the precise instruction submitted by a litigant, but need only give instructions which properly reflect the applicable law. Wilson v. National Union Fire Ins. Co., 27,702 (La.App.2d Cir.12/6/95), 665 So.2d 1252.
The adequacy of jury instructions must be determined in light of the instruction as a whole. Belle Pass Terminal Inc. v. Jolin, Inc., 92-1544 (La.App. 1st Cir.3/11/94), 634 So.2d 466, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094. A jury verdict will not be set aside because of an incorrect jury instruction absent a showing of prejudice such that the jury was misled and was unable to render a just verdict. Roger v. Dufrene, 97-1946 (La.App. 4th Cir.9/9/98), 718 So.2d 592. Appellate courts exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. Wilson, supra.
In the present case, the court instructed the jury that a plaintiff seeking an award of lost wages has a duty to mitigate those damages by using reasonable diligence to find other substantially equivalent employment. Defendant contends the court misstated the law in the portion of its instruction stating that plaintiff's damages could be reduced only if she voluntarily left her employment from positions held after her termination from defendant and failed to pursue other work. However, defendant has not shown how that part of the instruction was inconsistent with the law's requirement that plaintiff use reasonable exertion to find similar employment.
The defendant also contends the trial court erred in denying the requested jury instructions on the issues of burden of proof, course and scope of employment and vicarious liability. Defendant asserts that the jury should have been told that defendant would only be liable for Paxton's harassment if it were separately negligent and he was in the course and scope of his employment, and that the instruction failed to explain to the jury that once defendant gave a legitimate non-discriminatory reason, the plaintiff bears the burden of proving that the reason given was a pretext.
Here, the trial court instructed the jury that one of the elements of sexual harassment the plaintiff was required to prove was that defendant knew or should have known about the harassment. This is a correct statement of the law and addresses the issue of whether defendant acted reasonably under the circumstances, which is the proper negligence inquiry.
Contrary to defendant's assertion, the court instructed the jury that if Hanley presented evidence that she was terminated in retaliation, the burden shifts to defendant to present a non-discriminatory reason and if the jury finds that defendant "has met this standard, the burden shifts back to the plaintiff, Mrs. Hanley." Considering the jury instruction as a whole, we conclude the court adequately expressed the applicable law and did not err in refusing to give the requested instructions.

Emotional Distress Damages
The defendant contends the jury erred in awarding Hanley a total of $180,000 in *524 emotional distress damages. Defendant argues that the evidence does not support any damage award, or alternatively, that the awards are excessive and should be reduced.
General damages involve mental or physical pain and suffering, inconvenience, loss of intellectual or physical enjoyment or other losses of lifestyle that cannot be definitively measured in monetary terms. Robbins v. State Dept. of Labor, 31,590 (La.App.2d Cir.2/24/99), 728 So.2d 991. Before an appellate court may disturb such an award, the record must clearly show that the factfinder abused its broad discretion in making the award. Robbins, supra. The finding of an abuse of much discretion must be based on the particular injuries sustained and their effect on the particular injured person. After a determination that an award constitutes such an abuse of discretion, the appellate court may reduce or increase the award to the highest or lowest amount reasonably within the factfinder's discretion. Wilson, supra.
The United States Supreme Court has held that compensatory damages such as emotional harm caused by discrimination may be awarded only when claimants submit proof of actual injury. Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The existence, nature and severity of emotional harm must be proved. Such harm may manifest itself as anxiety, stress, depression or humiliation. Physical manifestations of emotional harm may consist of gastrointestinal disorders or headaches. Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927 (5th Cir.1996). To prove a claim for mental distress damages, there must be a specific discernable injury to a claimant's emotional state. Therefore, a claimant must present testimony or other evidence to show the nature and extent of the emotional harm caused by the alleged violation. Vadie v. Mississippi State Univ., 218 F.3d 365 (5th Cir.2000); Patterson, supra.
In the present case, Hanley's friend, Pamela Raspberry, testified that she was told about Paxton's inappropriate conduct by Hanley, who was "visibly affected" and troubled by the harassment. Raspberry stated that after the termination, Hanley was "really down, not motivated and obviously depressed."
Linda Ellis, a nurse and Hanley's sister-in-law, testified that she observed Paxton inappropriately touch Hanley, who became upset and went outside to cry. Ellis stated that the harassment caused Hanley to feel anxious, upset and sometimes depressed. Hanley's former boyfriend, Donald Miller, testified that as a result of the harassment, Hanley did not want to leave the house to go shopping or to eat. Miller stated that Hanley became solemn and was not happy.
Hanley's daughter, April Hanley, testified that after some of the incidents of harassment, her mother became upset and cried and that after the termination, Hanley was humiliated. April stated that her mother went through a period of depression at the time.
Hanley testified that Paxton's harassment caused her stress and that when they were required to work together on a regular basis she experienced "constant headaches, constant stomach aches, diarrhea, high blood pressure, [and] nausea. He made me sick." Hanley stated that she did not have any psychiatric or psychological therapy while working at Doctors Hospital, but had continued taking Prozac and Xanax.
Defendant cites Brady v. Fort Bend County, 145 F.3d 691 (5th Cir.1998), in support of its argument that the evidence *525 does not justify a compensatory award. However, the present factual situation can be distinguished from that of Brady, where the employee's own testimony was the sole source of evidence on emotional distress. Here, Hanley's testimony that the harassment caused her stress, headaches and high blood pressure was corroborated by other witnesses who observed that Hanley appeared anxious, depressed and solemn during the time that she was harassed. Her daughter testified that Hanley was humiliated as a result of the harassment and her termination.
We note that pursuant to Patterson, expert or medical evidence is not a prerequisite for an award of emotional distress damages. After reviewing the entire record, we conclude that the foregoing testimony was sufficient to support a finding that Hanley sustained an actual injury to her emotional state, as manifested by evidence that she experienced stress, anxiety depression and headaches. Consequently, we cannot say the jury abused its broad discretion in awarding this plaintiff emotional distress damages of $100,000 for the sexual harassment claim and $80,000 for the retaliation claim. The assignment of error lacks merit.

Allocation of Damages
Defendant contends the trial court erred in allocating all except $100 of the compensatory damages award to plaintiff's state law claims. Defendant points out that the issue of allocation has apparently not been addressed in a published opinion of Louisiana state courts or the U.S. Fifth Circuit Court of Appeal.
The U.S. Ninth Circuit has stated that generally, the district court has discretion regarding the allocation of the damage award. Passantino v. Johnson & Johnson Consumer Products, 212 F.3d 493 (9th Cir. 2000). In the absence of a statutory prohibition, we are persuaded that the trial court has the discretionary authority to allocate the damage award among the state and federal claims as would be consistent with the jury's verdict. Consequently, we conclude that the trial court did not abuse its discretion in its allocation of damages. The assignment of error lacks merit.

Punitive Damages
The defendant contends the jury erred in awarding punitive damages. Defendant argues that the evidence does not support such an award.
In order to recover punitive damages under 42 U.S.C. § 1981a(b)(1), the complaining party must demonstrate that the defendant engaged in a discriminatory practice with malice or with reckless indifference to the federally protected rights of the employee. Kolstad v. American Dental Assoc., 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); Patterson, supra. In addition, the plaintiff must show that the discriminatory act was committed by a managerial agent acting within the scope of his employment. Kolstad, supra. In the punitive damage context, an employer may not be vicariously liable for the discriminatory employment decision of managerial agents where those decisions are contrary to the employer's good-faith efforts to comply with Title VII. Kolstad, supra; Rubinstein v. Administrators, 218 F.3d 392 (5th Cir.2000).
Here, the record shows that Nettles and Shelton were acting in their supervisory capacity in making the decision to terminate Hanley and that Boyd possessed the final authority to dismiss employees as hospital administrator. Thus, the decision was made by defendant's managerial agents acting within the scope of their employment. We must next consider whether the discriminatory act was committed *526 with malice or with reckless indifference to Hanley's rights.
The evidence shows that prior to termination, the employer did not ask Hanley for an explanation of the errors which were purportedly the basis for her firing and did not allow her an opportunity to improve her performance. This procedure significantly departed from the defendant's usual practice at the time. Additionally, the termination memo expressly misrepresented that Hanley had been previously warned about the listed errors. The memo stated that patient safety required Hanley's immediate termination, but the testimony demonstrated that Hanley did not cause harm to any patient. The jury heard the explanations of the supervisory employees for their actions and weighed their credibility. Based on the evidence, the jury could have reasonably concluded that the defendant's representatives were consciously indifferent to the truth and legality of their actions with respect to Hanley's rights.
Defendant asserts that it should not be liable for the discrimination of its agents because it offered evidence of good faith efforts to comply with Title VII, including its written policy prohibiting sexual harassment and the presence of a human resources director. However, other than showing the policy was handed out to employees when hired, the evidence indicates that the defendant did not provide further training to employees regarding sexual harassment issues and failed to take even the minimal steps of posting the harassment policy in staff areas or periodically scheduling employee group conferences to review the policy.
In addition, the human resources director, Gail Modisette, testified that she knew Hanley had complained about inappropriate sexual behavior by Paxton, but did not ask him about his activities. Modisette stated that she understood Hanley was fired because of errors detrimental to patient care, but admittedly was unaware of whether any patient was actually placed at risk of harm by Hanley's conduct. Based upon this record, the jury could have inferred that defendant's policy against harassment was inadequately enforced and the assessment of punitive damages was warranted.
Defendant contends the punitive damages award is excessive. In determining whether a punitive damage award is reasonable, the court must consider: (1) the degree of reprehensibility of defendant's conduct; (2) the disparity between the harm suffered and the punitive damage award; and (3) the difference between the award in this case and comparable cases. We review the reasonableness of the jury's punitive damage award for an abuse of discretion. Patterson, supra.
In the present case, although the jury could infer that the defendant acted with indifference toward Hanley's rights, the record does not demonstrate a high degree of reprehensibility. As previously noted, the defendant had developed a policy against sexual harassment and provided notice to each employee. Regarding the second factor, we note that under the trial court's allocation of compensatory damages, there is a significant disparity between the emotional distress damages awarded for the federal claims and the punitive damage award of $299,900. In comparing the award in this case to that in comparable cases, we are guided by the punitive damage awards found reasonable in Title VII cases decided by the U.S. Fifth Circuit Court of Appeal. In Deffenbaugh-Williams v. Wal-Mart Stores Inc., 188 F.3d 278 (5th Cir.1999), an employment discrimination case, the court awarded $75,000 in punitive damages after reducing the jury's award.
*527 Applying the foregoing factors to the facts of the present case, we must conclude that the punitive damage award of $299,900 is an abuse of discretion. After reviewing the record, we find that the highest amount of punitive damages the jury reasonably could have awarded is $100,000. This amount will serve the purpose of the legislation, which is to penalize the defendant and deter other employers from engaging in such conduct in the future. In reaching this conclusion, we pretermit a discussion of the assignment of error concerning the application of the statutory damages cap under 42 U.S.C. § 1981a(b)(3).

Attorney Fees
The defendant contends the trial court erred in assessing attorney fees of $127,966. Pursuant to 42 U.S.C. § 1988(b), courts may award reasonable attorney fees to prevailing parties in civil rights cases. We review a district court's award of attorney fees for abuse of discretion. Giles v. General Electric Co., 245 F.3d 474 (5th Cir.2001). To determine a reasonable award, the district court should consider the twelve factors of Johnson v. Georgia Hwy. Express, 488 F.2d 714 (5th Cir.1974), including the novelty and difficulty of the case, the skill required to perform the legal services, the customary fee, the amounts involved and results obtained, the time and labor required and awards in similar cases.
First, the court calculates a "lodestar" fee by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating lawyers. Migis v. Pearle Vision Inc., 135 F.3d 1041 (5th Cir.1998). An appropriate hourly rate is based on prevailing community standards for attorneys of similar experience in similar cases. Alberti v. Klevenhagen, 896 F.2d 927 (5th Cir.1990). The court then considers whether the lodestar figure should be adjusted upward or downward depending on the circumstances of the case. Migis, supra.
In the present case, plaintiff's counsel sought the hourly rate of $175 for herself and $110 for co-counsel. Defendant complains the court abused its discretion in setting the hourly rate and allowing recovery for both of plaintiff's attorneys to attend the entire trial.
The court set the hourly rate for attorney Lyons at $150 based upon her 19 years of experience and her performance during the trial. The court found that plaintiff's use of two lawyers throughout the six-day trial was reasonable given the complexity of the issues and the fact-intensive nature of the case. The court found that Hanley's attorneys shared responsibility in questioning witnesses and that the hourly rate of $110 for attorney Walker was reasonable. The trial court declined to enhance the lodestar figure for delay in the payment of damages as requested by plaintiff, but assessed legal interest from the date of judicial demand. The court found that although the costs for paralegal work and photocopying seemed slightly high, they were not excessive.
We note that the court reviewed the plaintiff's attorney fee application, which included detailed records of the hours expended by her counsel in the case and a comprehensive discussion applying the Johnson factors. The record shows that the discovery process was extensive, with 36 depositions by the parties and disputes resulting in two applications for supervisory writs to this court. Plaintiff's counsel successfully opposed two motions for summary judgment and the jury instructions were strongly contested.
Applying the Johnson factors, the time and labor required and the skill and *528 experience of the attorneys are reflected in the lodestar figure computed by multiplying the hours expended by attorneys Lyons and Walker by their respective hourly rates. The court addressed defendant's objection that the time charged for preparing the pre-trial order was duplicative, specifically finding that the time expended by plaintiff's lawyers was appropriate.
In reviewing the time sheets for the paralegal services, we note numerous entries labeled as "summarize depositions," "preparation for trial" and "work on exhibit books." Such general labels do not give the court sufficient information to determine the specific service performed or whether the work was reasonably necessary. Consequently, the trial court erred in allowing full recovery for the total amount of those hours. We shall subtract 76 hours, or $3,800, from the total amount for paralegal services to adjust for the excessive award. We shall also delete the amount of $36.44 charged for attorney meals.
Defendant also contends the court erred in assessing interest on the attorney fees from the date of judicial demand. The interest on an attorney fee award runs from the date of the judgment establishing the right to the award. Jenkins by Agyei v. Missouri, 931 F.2d 1273 (8th Cir.1991); Sharbono v. Lang & Son Loggers, 97-0110 (La.7/1/97), 696 So.2d 1382. Thus, we shall amend the judgment to assess interest on the award of attorney fees from the date of judgment.
In light of the detailed records submitted by plaintiff's counsel and the trial court's review of the documentation, with the exception of the reductions in the paralegal fees and meal costs, we shall otherwise affirm the trial court's fee award.

CONCLUSION
For the foregoing reasons, that part of the judgment awarding punitive damages is amended and the amount of $100,000 in punitive damages is hereby awarded to plaintiff. Additionally, the attorney fee award is reduced by the amount of $3,836, resulting in an attorney fee award of $124,130. Interest on the award of attorney fees is assessed from the date of judgment. The judgment is in all other respects affirmed. Costs of this appeal are assessed to the appellant, Doctors Hospital of Shreveport.
AMENDED AND AFFIRMED AS AMENDED.
CARAWAY, J., concurs in part and dissents in part with reasons.
CARAWAY, J., concurring in part and dissenting in part.
I concur with the majority's rulings regarding Hanley's sexual harassment claim for hostile work environment and her claim for the defendant's retaliation. Nevertheless, I respectfully dissent regarding the award for punitive damages, based upon the discussion of the requirement for malice or reckless indifference in Kolstad v. American Dental Association, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999).
In this type of case, inferences properly drawn from circumstantial evidence are essential for the trier of fact to determine that an illegally motivated employment decision occurred. A crucial fact, setting the bar high for any inference of corporately motivated malice in this case, is the perpetrator/co-worker's relatively insignificant position in the organization. This is not a case of a highly positioned agent/supervisor, who not only directly sexually harasses the employee, but also influences the corporation for an adverse employment action. *529 An employee's accusation against such a powerful corporate official is effectively a charge directly against the corporation, and malicious actions may ensue. This is not a case like Kolstad, where the corporate decision maker directly and intentionally denied the plaintiff an employment promotion based on her sex. This is a case where a group of three female supervisors negligently minimized charges against a male minion whose lewd conduct violated Title VII by creating a hostile work environment. It is difficult enough to transform the supervisors' negligent indifference to the charge against this subordinate into intentional deliberations to retaliate against Hanley for bringing up the charge in the first place. It is most difficult, and unsubstantiated in this case, to infer that the retaliation was not merely intentional, but made with malice or with reckless indifference to Hanley's federally protected rights.
While this is a clear situation of corporate negligence for allowing Hanley to suffer sexual harassment by Paxton, the retaliation claim is a much closer case. Hanley sought to enforce her Title VII protection to prevent Paxton's conduct. Some six months later, after Paxton and Hanley were no longer working together and the hostile environment might be considered by the hospital as a thing of the past, the negligent staff, which at first had placed little significance on Paxton's conduct, develops newfound concerns causing a retaliatory discharge of Hanley. Why? The inferences that flow from these circumstances are mixed. There is no direct evidence that Hanley had ever threatened the hospital for its negligence in allowing the hostile work environment. She may not have even understood at the time that she had a claim against the hospital for her co-worker's actions. Thus, the inference that the hospital retaliated after the co-workers were no longer working together is rather weak. Most parties avoid the "sleeping dog."
More significantly, the hospital met its burden of showing that Hanley was discharged for legitimate, nondiscriminatory reasons. Regardless of the comparison that was made concerning the hospital's disciplinary actions towards other nurses that made medical errors, Hanley's medical errors were serious mistakes. Those mistakes, coupled with her overall employment record before and after her report of Paxton's conduct, gave the hospital real cause to discharge her. In the absence of her standing as a person who had asserted her Title VII protections, the fact that the hospital discriminated in its employment decisions concerning her and other nurses was irrelevant since our employment law does not otherwise involve itself with such unfair and subjective treatment. See, Stevenson v. Lavalco, Inc., 28,020 (La.App.2d Cir.2/25/96), 669 So.2d 608. Hanley was an at-will employee who could be dismissed for no reason or unfairly in relation to others. The fact that the evidence of the other discipline against nurses was relevant to show that retaliation in this Title VII setting may have in part prompted the hospital's action does not diminish the seriousness of Hanley's medical mistakes.
I agree with the majority that the jury could decide this rather close issue of whether a retaliatory motive for Hanley's discharge existed. However, with the hospital's evidence of Hanley's medical malpractice, I do not find that the malice or reckless indifference standard under Kolstad was proven. As the Kolstad ruling stated:
There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard. In some instances, the *530 employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized,
. . .
Id. at 536-537, 119 S.Ct. 2118. I find it much more likely that the negligent hospital staff was still unaware of the full extent of Hanley's federally protected rights and made the decision to discharge her, believing that her serious mistakes justified their decision, regardless of whether they were also motivated in part by her complaint of Paxton's harassment. I do not find sufficient evidence of malice or reckless disregard for her rights and would reverse the award of punitive damages.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, GASKINS, and CARAWAY, JJ.
Rehearing denied.
CARAWAY, J., would grant rehearing.