877 So.2d 1194 (2004)
G. Jean BROOKS
v.
SOUTHERN UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE; Board of Supervisors, Southern University and Agricultural and Mechanical College.
No. 2003-CA-0231.
Court of Appeal of Louisiana, Fourth Circuit.
July 14, 2004.
Rehearing Denied August 4, 2004.
*1198 Victor R. Farrugia, Victor R. Farrugia, PLC, New Orleans, LA, for Plaintiff/Appellant.
Richard P. Ieyoub, Attorney General, M.H. Gertler, Assistant Attorney General, Jill D. Trahan, Assistant Attorney General, Gertler, Gertler, Vincent & Plotkin, New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, JR.).
PATRICIA RIVET MURRAY, Judge.
Defendants, Southern University and Agricultural and Mechanical College of New Orleans and its Board of Supervisors [hereinafter collectively referred to as "SUNO"], appeal the trial court's judgment in favor of plaintiff Jean Brooks, a former SUNO instructor, awarding her damages for sexual harassment, gender discrimination and retaliation. Ms. Brooks also appeals the judgment, alleging that the trial court improperly granted a JNOV that significantly reduced the amount of damages as determined by the jury. Additionally, both parties appeal a companion judgment, rendered the same day, which awarded attorney fees and costs. Ms. Brooks contends that the trial court awarded an insufficient amount of attorney fees, and SUNO contends that the trial court awarded an excessive amount of costs. For the reasons that follow, we amend both judgments and affirm as amended.

FACTS AND PROCEEDINGS BELOW
Jean Brooks was hired by SUNO in August of 1992 to work in a dual capacity: as an instructor in the Health and Physical Education Department, a full- time position, and as the coach of the women's basketball team, a part-time position. Each position was subject to a year-to-year contract. With respect to her coaching position, Ms. Brooks' immediate supervisor was Earl Hill, SUNO's Athletic Director and men's basketball coach. Beginning in March of 1997, Jean Brooks twice filed and then dropped written complaints against Earl Hill alleging gender discrimination and sexual harassment. Apparently, the complaints were withdrawn by Ms. Brooks in an effort to cooperate with SUNO's attempts to work things out between herself and Mr. Hill. She filed a third complaint in March of 1998, which eventually was heard by a *1199 SUNO grievance committee and was determined to be without merit. However, in February of 1998, Ms. Brooks was notified by the Chancellor of SUNO that her contract as an instructor, which was due to expire in June, would not be renewed for the 1998-99 school year. Then in May of 1998, Ms. Brooks was informed that her position as head coach of the women's basketball team also would be allowed to expire and would not be renewed for the next season.
On February 23, 1999, Ms. Brooks filed the instant lawsuit against SUNO alleging gender discrimination, sexual harassment and retaliation. The case was tried to a jury for eight days. At the conclusion of the trial, the jury found that SUNO was guilty of both sexual harassment and gender discrimination toward Jean Brooks, and that SUNO's decision not to renew Ms. Brooks' contracts as instructor and coach was made in retaliation for her assertion of such claims against Earl Hill. The jury found that Ms. Brooks was entitled to $8,000.00 in damages for lost income and $475,000.00 in general damages for emotional pain and suffering, mental anguish, humiliation, shame, loss of self-esteem, embarrassment, and injury to her reputation.
After the rendition of the jury verdict, SUNO made motions for JNOV, for remittitur and for new trial. From the bench, the trial court denied the motions for JNOV and for new trial, but granted a remittitur reducing the amount of general damages to $65,000.00. However, a judgment on the remittitur was never entered because the plaintiff declined to consent, as is required by Louisiana Code of Civil Procedure article 1814. On March 26, 2002, the trial court rendered judgment vacating the granting of the remittitur (which judgment actually had never been signed), denying SUNO's motion for new trial, granting the previously denied motion for JNOV, and awarding damages in the amount of $65,000.00 to the plaintiff.
The plaintiff then filed a motion for attorney fees and a motion to amend the March 26th judgment to correct certain procedural errors.[1] The trial court on its own motion granted a new trial to correct those errors. Following a hearing on the attorney fee issue, the court on April 10, 2002, rendered two separate judgments: 1) an "Amended Judgment," which was identical to the March 26th judgment except that it cited both defendants (SUNO and the Board of Supervisors of SUNO) and included the $8,000 originally awarded for loss of income; and 2) a judgment awarding the plaintiff $29,200.00 (forty percent of the total award of $73,000) in attorney fees and $6,033.38 in costs.
Both Jean Brooks and SUNO have devolutively appealed the two judgments rendered on April 10, 2002. Ms. Brooks asserts that the trial court erred by granting the JNOV on damages and by awarding an insufficient amount of attorney fees. SUNO asserts that evidentiary errors made by the trial court unfairly prejudiced the jury, which necessitates a de novo review; that the trial court erred by finding SUNO liable for sexual harassment; that the trial court erred by finding SUNO liable for gender discrimination; that the trial court erred by finding that SUNO's failure to renew Ms. Brooks' contracts constituted retaliation; and finally, that the *1200 trial court included improper items in its award for court costs.

LIABILITY

A. Standard of Review
We first address SUNO's contention that a de novo review is required because the trial court's errors in admitting improper evidence unfairly tainted the jury's verdict. When a trial court makes one or more prejudicial legal errors which interdict the fact-finding process, the manifest error standard is no longer applicable, and the appellate court is obliged to make its own independent, de novo review of the record if such is complete. Evans v. Lungrin, 97-0541, 97-0577, p. 7 (La.2/6/98), 708 So.2d 731, 735; McLean v. Hunter, 495 So.2d 1298,1303-04 (La.1986). The Supreme Court stated in Evans: "Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights." 97-0541, p. 7, 708 So.2d at 735. However, under Evans, a de novo review should not be undertaken for every evidentiary exclusion error. De novo review should be limited to consequential errors, which are those that have prejudiced or tainted the verdict rendered. Wingfield v. State ex. rel. Dept. of Transportation and Development., 2001-2668, 2001-2669, p. 15 (La.App. 1 Cir. 11/8/02), 835 So.2d 785, 799.
In the instant case, SUNO cites three particular instances in which it claims prejudicial evidentiary errors were made: (1) the trial court's admission of the testimony of two former SUNO work study students who had lodged sexual harassment complaints against Earl Hill prior to the plaintiff's employment by the university; (2) the trial court's admission of certain testimony by plaintiff's witness, Charles Jones, which defendant contends was hearsay; and (3) the trial court's refusal to grant a mistrial after sustaining defendant's objection to a question posed by plaintiff's counsel to SUNO employee Sherrye Carradine asking whether she had ever filed sexual harassment charges at SUNO. We discuss each issue in turn.

1. Evidence of prior sexual harassment complaints
Prior to trial, the trial court denied SUNO's motion in limine to exclude the testimony of two former SUNO students, Alicia Porter and Orlinda Stansberry Jackson, each of whom had filed a formal sexual harassment complaint against Earl Hill in the spring of 1992, a few months prior to SUNO's hiring of Jean Brooks.[2] After these two complaints were filed, SUNO formed a committee to hear the complaints. Neither student appeared at the committee hearing, which was held in May, 1992; however, Earl Hill did appear and testify. At the conclusion of the hearing, the committee found insufficient evidence to support the complaints.
At trial, Alicia Porter testified she was a freshman work-study student assigned to work in the Athletic Department in March of 1992. She stated that Coach Hill made her uncomfortable by repeatedly asking her if she thought he was attractive. He also called her on the phone and asked what she wanted for her birthday and whether she wanted something special, saying he could do a lot for her. He also told her not to tell anyone it was him on the phone. When she made it clear she didn't want anything from him and then said she had to go and hung up, he told her he would call her later. Another day he called her into his office and asked whether she was married, to which she *1201 responded that she was. He said that maybe he shouldn't have said anything to her because "you know there's a lot of sexual harassment charges going around." When she responded she wasn't the type to file charges, he tried to get her to come around the desk and give him a hug and kiss, but she refused. Ms. Porter testified that all of Coach Hill's advances were unwelcome, and that she refused them all. Finally, she stated that Coach Hill told Ms. O'Neal, who supervised the work-study students in the Athletic Department, that he wanted the students to dust when they did not have any other work to do, but Ms. O'Neal did not make them dust because they were supposed to be able to study if there was no clerical work for them to do. Ms. Porter's formal complaint, introduced into evidence, tracks her testimony. She testified that she did not know about the hearing SUNO conducted regarding her complaint. To rebut her testimony, SUNO introduced a letter mailed to Ms. Porter informing her of the time and place of the hearing and of her right to testify. Ms. Porter also testified that she did not act in concert with Orlinda Stansberry, who had also filed a complaint against Coach Hill during the same time period.
In lieu of live testimony, the deposition of Orlinda Stansberry Jackson, who was living in Atlanta at the time of trial, was read into the record. Like Ms. Porter, in 1992 Ms. Jackson was a work-study student assigned to the Athletic Department under the supervision of Ms. O'Neal. She testified that on various occasions, Coach Hill told her that she was beautiful and that he wanted to be with her; invited her to his apartment and told her he had keys for her; sneaked up behind her while she was studying at a desk and kissed her; and finally, suggested that she take a peppermint he was eating right out of his mouth (in response to her asking whether she could take a peppermint from the jar on his desk). She testified that these incidents were unwelcome, that they always occurred in private, and that Coach Hill repeatedly asked her not to tell anyone about them. Because of Coach Hill's behavior, Ms. Jackson asked for and received a transfer out of the Athletic Department. She also filed a formal complaint with SUNO charging Earl Hill with sexual harassment. SUNO introduced a certified letter signed for by Ms. Jackson's father informing Ms. Jackson about the hearing and her right to appear. Ms. Jackson testified that although she was aware of the hearing, she did not attend because she was afraid to face Coach Hill, and she had already been transferred out of the Athletic Department. She did not pursue the matter further because she believed the complaint would go on Coach Hill's records regardless of the outcome of the hearing. She also testified she did not act in concert with Alicia Porter and did not know the outcome of Ms. Porter's complaint.
On appeal, SUNO argues that even if the testimony of the two work-study students is relevant, it nevertheless should have been excluded under Louisiana Code of Evidence article 403 because its probative value was outweighed by the danger of unfair prejudice. Moreover, SUNO contends the admission of the testimony violated Code of Evidence article 404(B), which states that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."[3] Considering these standards, we first must determine whether the trial court clearly abused its discretion by denying *1202 SUNO's motion in limine. Jones v. Peyton Place, Inc., 95-0574 (La.App. 4 Cir. 5/22/96), 675 So.2d 754. Then, if we find the trial court committed legal error by admitting the testimony, we must determine whether that error was so consequential that it tainted the verdict or prejudiced the outcome. Evans v. Lungrin, 97-0541, 97-0577, p. 7 (La.2/6/98), 708 So.2d 731, 735; McLean v. Hunter, 495 So.2d 1298,1303-04 (La.1986).
As the Supreme Court stated in Evans v. Lungrin supra: Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. Id., p. 7, 708 So.2d at 735. Thus, a de novo review should not be undertaken for every evidentiary error, as unnecessary steps of review not only usurp the jury's function, but are a clear waste of judicial economy. Wingfield v. State Dept. of Transportation and Development, 2001-2668, 2001-2669, p. 15 (La.App. 1 Cir. 11/8/02), 835 So.2d 785, 799 (citing Evans, supra).
In the instant case, we find the trial court did not abuse its discretion by allowing the testimony of Ms. Porter and Ms. Jackson. Considering that the plaintiff has alleged that she was sexually harassed by her male supervisor in a work environment, evidence that the same supervisor exhibited similar behavior toward other females who worked under his supervision is clearly relevant. Moreover, although the incidents related by Ms. Porter and Ms. Jackson occurred several months before Ms. Brooks began working at SUNO, these incidents were not so attenuated in time as to be stripped of their relevance.
In addition, we find that the testimony of the work-study students was more probative than prejudicial. Because sexual harassment generally occurs in private without witnesses, the testimony of others who claim to have suffered similar treatment as that of the victim from the same harasser is often the only support for the victim's story, and in that sense is highly probative. In our view, the probative value of this type of evidence clearly outweighs any prejudice to the defense. In a case similar to the instant one, wherein the plaintiffs worked in a medical clinic and sued a co-employee / physician, as well as their employer, for sexual harassment, this court found that it was error for the trial court to have excluded the deposition testimony of three women who each claimed the physician had had an unwelcome sexual encounter with her (two of which had occurred in the clinic and one at a private home). In that case, we determined that the deposition testimony was more probative than prejudicial. See Lawson v. Strauss, 98-2096, p. 7 (La.App. 4 Cir. 12/8/99), 750 So.2d 234, 239-240.
SUNO argues, however, that the testimony of Ms. Porter and Ms. Jackson should have been excluded under La.C.E. article 404(B) as impermissible evidence of other crimes or wrongs. In this vein, SUNO first notes that because its committee investigated the students' complaints and found insufficient support for them, there is no proof that Coach Hill committed these wrongs and therefore they must be excluded. We disagree. The jury heard the witnesses' testimony as well as the fact that a SUNO committee dismissed the witnesses' complaints for lack of support following a hearing at which neither complainant showed up. Each witness was questioned about why she did not show up for the administrative hearing. It is the province of the jury to judge the credibility of those witnesses with regard to whether Earl Hill behaved toward them as they said he did. The incidents to which Ms. Porter and Ms. Jackson testified are not crimes. Earl Hill is not a criminal defendant; in fact, he is not a *1203 defendant at all in this case, which concerns only the liability of SUNO for his actions. Evidence concerning Coach Hill's possible sexual harassment of others at SUNO is relevant to the determination of whether an atmosphere of sexual harassment existed at the plaintiff's workplace and whether SUNO was responsible for it under the doctrine of respondeat superior. Despite SUNO's contention, the admissibility of this evidence is not foreclosed by cases holding that in order to introduce evidence of a prior offense in a criminal trial, the State must be able to prove that the defendant actually committed that prior offense. Accordingly, we conclude that the trial judge did not err or abuse its discretion by denying SUNO's motion in limine.

2. Hearsay evidence
SUNO next argues that the trial court committed reversible error by admitting hearsay testified to by Charles Jones. Mr. Jones, who served as an equipment manager / trainer in the Health and P.E. Department at SUNO during the plaintiff's tenure there, was the first witness called by the plaintiff's counsel. Over defendants' objection, he testified that a work-study student, Orlinda Jackson, refused to monitor the phones in the offices where Coach Hill was working and when asked why, Ms. Jackson told him Coach Hill had kissed her and had asked her friend, another student, to go to bed with him. Mr. Jones testified that he had advised Ms. Jackson to file a complaint with the university.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La.Code Evid. Ann. art. 801(C) (West 1995). Hearsay is generally inadmissible. Id. art. 802. The trial court's erroneous admission of hearsay testimony is subject to the harmless error analysis. State v. Perkins, 97-1119 (La.App. 3 Cir. 6/17/98), 716 So.2d 120. The admission of a hearsay statement that is merely cumulative or corroborative of other evidence is generally held to be harmless error. State v. Lavigne, 95-0204 (La.App. 4 Cir. 5/22/96), 675 So.2d 771; State v. Hawkins, 90-1235 (La.App. 4 Cir. 9/15/95), 667 So.2d 1070, affirmed 96-0766 (La.1/14/97), 688 So.2d 473. When the declarant is present at trial and testifies regarding the same information contained in the hearsay, the hearsay is merely corroborative, and the error is harmless. See, e.g.: State v. Ditcharo, 98-1374 (La.App. 5 Cir. 7/27/99), 739 So.2d 957; State v. Smith, 97-1075 (La.App. 5 Cir. 4/15/98), 710 So.2d 1187.
In the instant case, the trial court's allowance of Mr. Jones' testimony concerning what was told to him by Orlinda Jackson, even if erroneous, was harmless in light of the admission into evidence of Ms. Jackson's deposition testimony concerning the same subject matter. Such an error would not be sufficient to trigger de novo review.

3. Improper Questioning of Witness
SUNO contends that an improper question posed by plaintiff's counsel to one of the plaintiff's witnesses, Sherrye Carradine, unfairly prejudiced the jury and affected the verdict. The plaintiff's counsel asked Ms. Carradine, an employee of SUNO, whether she had ever filed "sex harassment charges at the university." SUNO objected to the question as irrelevant, and a discussion among counsel and the court, in the presence of the jury, ensued, during which plaintiff's counsel made the comment: "It's the same  Same sex harassment charge against someone in the university." The trial judge then asked the witness how many instructors *1204 were at the university, to which she responded that there were 250 to 300 faculty members. At this point the trial judge retired to his chambers to confer with counsel, which conference was transcribed into the record. SUNO's counsel noted that the question was intended to refer to a charge of sexual harassment made by the witness, Ms. Carradine, against the current Chancellor of SUNO, who was not at SUNO during Ms. Brooks' tenure; the charge had no relationship to Earl Hill. The trial judge decided that although the question was improper and irrelevant, the fact that the jury heard it did not warrant a mistrial. He resumed the trial, and instructed the jury as follows:
Anyway, where we were Mr. Farrugia [plaintiff's counsel] had asked if in fact perhaps this lady had filed anything. My ruling is that it's really irrelevant and like I say, I don't want to be out in the gulf waters on a fishing expedition, because, you know, anybody could do anything, I suppose. So it was a gratuitous remark. And I'm going to rule that it's irrelevant so she doesn't have to worry about answering. It's kind of a little play.
SUNO now contends that despite the court's remedial instruction, the improper question unfairly prejudiced the jury by implying that sexual harassment was rampant at SUNO, which tainted the verdict. We do not agree. Although improper, the posing of that one question, in and of itself, was not sufficient to raise the inference that SUNO had a huge sexual harassment problem or that the university routinely condoned sexual harassment. We believe the trial judge's sustaining of the objection and his additional instruction to the jury that the question was irrelevant sufficiently cured any potential prejudicial effect on the verdict. The trial court did not err by refusing to declare a mistrial.
Accordingly, we conclude that none of the alleged evidentiary errors cited by SUNO warrant a de novo review of the finding of liability. We therefore are mandated to employ the manifest error/clearly wrong standard of review.

B. Jury's Verdict
The trial court accepted the jury's verdict with regard to SUNO's liability. As reflected in its answers to the jury interrogatories, the jury made the following factual determinations based upon the evidence presented to it: (1) Jean Brooks was subject to unwelcome sexual harassment by Earl Hill while she was at SUNO; (2) The non-renewal of Ms. Brooks' contracts of employment as both coach and instructor was the culmination of Mr. Hill's harassment; (3) Gender discrimination was a determining factor in the non-renewal of Ms. Brooks' contract as coach, but was not a determining factor in the non-renewal of her contract as instructor; (4) SUNO retaliated against Jean Brooks for her having filed complaints of sexual harassment by not renewing her contracts of employment as coach and instructor.

C. Discussion of the Evidence
Jean Brooks testified that when she first started working at SUNO, she had a good relationship with Coach Hill, who had hired her, except for the fact that he kept asking her why she had not dated him in high school. Although she and Coach Hill had attended the same high school, Ms. Brooks explained that they had not hung around in the same crowd. Coach Hill then began asking her to go out with him, which she refused to do because she was not interested. He continued to ask, about once a month, and then questioned her as to why she did not want to go out with him. He told her he was big and handsome, he didn't smoke, drink, use drugs, or *1205 beat women, and he took care of his children. He also periodically made comments about her appearance, such as suggesting she should wear a shorter dress. Once he asked her if she was wearing a bra, saying that he could see her nipples through her t-shirt and it turned him on.
Ms. Brooks stated that she sometimes made excuses to put Coach Hill off, such as reminding him that he already had a girlfriend or telling him that she thought of him as family. Ms. Brooks testified that she never encouraged Coach Hill; in fact, she tried to avoid him. However, it got to the point where every private meeting she had with him in his office ended with his asking her out and making other personal comments, such as asking her why she wasn't being nicer to him. He told her that if she was "nice," she did not have to worry about losing her job, and he would buy her nice things. Ms. Brooks explained that she sometimes invented excuses to discourage him because she was worried about offending him and about losing her job. For instance, when he offered to make her dinner at his house, she refused, but said she would think about it. Another time, just to get out of his office after he had asked when she was going to be nice to him, she said she would surprise him. According to her testimony, after that incident he repeatedly told her he was still waiting for his surprise. Ms. Brooks stated she dreaded going to his office and avoided it as much as possible.
According to Ms. Brooks, after she had repeatedly refused Coach Hill's advances, sometime in 1995 or 1996, he began to interfere with her coaching of the basketball team in ways she believed to be unfair. For instance, he made her cut her practice time from three hours to two hours daily, and he sent her a letter requiring her to wear a uniform shirt to practices, although the male coaches did not have to wear a particular shirt. She believed he forced her to coach with student assistants rather than a regular assistant and deliberately did other things, such as waiting until the last minute to sign her requisition forms, or making her girls' basketball team late for important games, apparently to sabotage her record. He also ceased communicating with her directly, forcing her to go through others or to communicate solely in writing.
On November 4, 1996, Ms. Brooks sent Coach Hill a letter, which was introduced into evidence. In it, she did not specifically allege discrimination or harassment, but she requested that he meet with her in an effort to "recreate" their once "wholesome" relationship and to discuss her job requirements. Mr. Hill declined her request for a meeting because he did not like the fact that her letter was copied to an attorney and to her minister. Shortly thereafter, Coach Hill sent Ms. Brooks a letter complaining about her violation of the mandatory study hall policy for her players; she sent him a written response, explaining that she found it more effective to speak directly with the instructors of any classes in which her players were doing poorly. She also spoke with Robert Gex, then Chancellor of SUNO, about her concerns for the women's basketball program, and then sent him a letter on November 15, 1996, thanking him for allowing her to express her concerns and telling him she was following his advice to put all her communications with Coach Hill in writing. On November 19, she sent Chancellor Gex a letter requesting a meeting with him and Coach Hill to resolve her concerns about the women's basketball program. During this time, she continued to communicate in writing with Coach Hill about various coaching issues, such as her request that she be allowed to reinstate three-hour practices. In writing, Coach Hill refused her request and stated that he *1206 did not want to receive any more correspondence regarding the matter.
On December 16, Ms. Brooks sent another letter to Chancellor Gex reminding him of her request for a meeting. On January 6, 1997, Coach Hill sent Chancellor Gex a recommendation that Ms. Brooks receive a one-game suspension without pay for insubordination with regard to the two-hour practice limit; the recommendation was accepted. On January 24, Coach Hill sent a letter to Ms. Brooks scheduling a meeting in his office that same day with the Department secretary present to take notes. Ms. Brooks testified that the letter was hand delivered to her between 2:00 and 2:30 p.m., and as she had practice scheduled at 3:00 p.m., she went to Coach Hill to request another time. However, when he insisted on meeting with her right then, she refused and went to practice, as her team had a game the next day. Shortly thereafter, Ms. Brooks heard a rumor that Coach Hill had recommended she be fired because she did not have a winning record; she testified that Chancellor Gex confirmed the rumor to her but told her he had not decided whether to accept Coach Hill's recommendation.
On March 14, 1997, Ms. Brooks sent Chancellor Gex a letter saying she was formally charging Coach Hill with "Sexual Discrimination/Harassment" based on his having singled her and her program out with unfair restrictions, causing her undue stress and anguish, and noting his "documented history of placing undue pressure and stress on the majority of females he [had] supervised." The formal complaint form that Ms. Brooks later filled out listed eight specific incidents, all having to do with Coach Hill's decisions regarding her team and her coaching of it, which she believed evidenced his attempt to sabotage her record so that he could fire her. After she filed the complaint, Ms. Brooks' attorney spoke with Chancellor Gex.
According to Ms. Brooks' testimony, on the advice of her attorney, she agreed to withdraw her formal complaint in exchange for the Chancellor's verbal promise to address her concerns and not to terminate her. On May 15, 1997, she sent Chancellor Gex a letter withdrawing her complaint. Subsequently, she attended a meeting with the Chancellor, SUNO's attorney, her own attorney, and Coach Hill. Ms. Brooks testified that at a certain point in the meeting, she and Coach Hill were asked to leave with the understanding that the other three parties would work out an agreement. Ms. Brooks believed, however, that her attorney was to contact her before he signed anything. Approximately two weeks later, her attorney mailed her the Chancellor's written summary of specific terms to which all parties had allegedly agreed in the meeting, although Ms. Brooks had not been consulted. The agreement did not mention any of the prior sexual conduct of Coach Hill; it merely addressed the items Ms. Brooks had listed in her formal complaint, which were limited to coaching-related issues. According to her testimony, Coach Hill had stopped making sexuallyoriented remarks to her after he had learned she was going to file a formal complaint; from that point on, he had instead completely stopped speaking to her.
A memorandum dated June 30 from Dr. Gex to Ms. Brooks, her attorney, Mr. Hill, and SUNO's attorney, summarized the agreement reached among those parties at the prior meeting. The first stipulation was that Ms. Brooks' employment as basketball coach would be continued through the 1997-1998 fiscal year. Another stipulation was that Ms. Brooks would be allowed to conduct three-hour practices. In addition, the agreement defined a "successful" season for women's basketball as one in which the team had a winning record, that is, won more games than it lost. *1207 The memorandum noted Coach Hill's concern that in five seasons at SUNO, Ms. Brooks had not yet achieved a winning season. The agreement further stipulated that Coach Hill would continue to be the prime evaluator of Ms. Brooks' performance as a coach, but that his evaluation would be closely tied to the win/loss record of her team. Coach Hill acknowledged that the requirement of wearing uniform practice shirts should have been applied to all coaches or to none of them, but stated that he had issued it in response to what he believed was inappropriate clothing worn by Ms. Brooks. Other points of the agreement involved assistant coaches, salaries for male and female coaches, transportation to away games, and budget appropriations for men's and women's teams.
Ms. Brooks testified that she was unhappy with many provisions in the agreement; specifically, she was concerned that Coach Hill would continue to be the primary evaluator of her job performance. Although the agreement stipulated that Coach Hill's evaluation would be closely tied to her team's record, Ms. Brooks believed that Coach Hill was deliberately trying to sabotage her efforts to improve that record. Because she was unhappy with the agreement, Ms. Brooks dismissed her attorney and hired a new one. On July 7, 1997, she sent Dr. Gerald Peoples, who had become Chancellor of SUNO on July 1st, a letter informing him that she was re-filing her previously withdrawn sexual discrimination claim against Earl Hill and was adding a sexual harassment claim, noting that Mr. Hill had become increasingly hostile and antagonistic toward her personally and professionally. In the accompanying formal complaint on sexual harassment, Ms. Brooks documented numerous incidents of "unsolicited and unwanted sexual remarks" made by Coach Hill from the fall of 1992 to the spring of 1996.[4] Under "desired action / outcome," she wrote that she wanted the harassment to stop and for SUNO to do "whatever is appropriate for the offense."
Shortly after she filed her second complaint, Coach Gerald Kimble, a retired SUNO coach and a friend of Ms. Brooks and of Coach Hill, called Ms. Brooks. According to Ms. Brooks, Coach Kimble told her that he was acting as an intermediary at the request of Chancellor Peoples and Coach Hill. Ms. Brooks testified that Coach Kimble promised her that in exchange for dropping her charges against Coach Hill, SUNO would allow her to run her basketball program without interference for three years, during which time the university would not terminate her. Although this agreement could not be put in writing because all untenured instructors such as Ms. Brooks were required to have year-to-year contracts, Coach Kimble allegedly told Ms. Brooks that if SUNO reneged on the deal, she could re-file the charges and he would testify in her defense.
As a result of her conversation with Coach Kimble, Ms. Brooks sent Chancellor Peoples a letter on July 27, 1997, informing him that she was withdrawing her July 7th complaint because she had decided to extend a "spirit of cooperation to the new administration." She also requested a meeting with Dr. Peoples and Coach Hill. Two days later, Ms. Brooks was sent formal notification that her employment as an instructor in the Health and P.E. Department was being renewed for the 1997-1998 academic year.
*1208 According to her testimony, however, Ms. Brooks continued to have trouble with Coach Hill. She claimed he upset her by telling her at the last minute that her teenage niece, of whom she had custody, could not ride the bus to an away game, forcing her to drive behind the bus in her car. She also testified that he deliberately made the girls' team late for their final game by being two hours late for the bus and then by stopping on the way to feed the boys' team, whose game was later, before they arrived. Ms. Brooks believed Coach Hill was trying to sabotage her team by forcing them to play with only ten minutes of warm-up time, thus ensuring she would not have a winning season. Nevertheless, her team won the game, which meant they had won more games than they had lost, thus achieving her first winning season at SUNO. Despite this fact, Ms. Brooks received formal notice from Dr. Peoples on February 27, 1998, that her employment as an instructor in the Health and P.E. Department, which accounted for ninety percent of her salary, would terminate when her yearly contract expired on June 10, 1998. Because the letter stated that Ms. Brooks had not been recommended for continued employment, she contacted her immediate supervisor, Dr. Artis Davenport, then Chairman of the Health and P.E. Department. Dr. Davenport told Ms. Brooks that he was surprised to hear of her termination, that he had never been asked whether he would recommend her for continued employment, and further, that he had never had to recommend her in past years, when her contract had been automatically renewed. Dr. Davenport then wrote a memorandum to Dr. Patricia Harris, Vice-Chancellor for Academic Affairs, informing her that he did recommend that Ms. Brooks be continued, but Dr. Harris responded that it was too late to change the decision.
On March 17, 1998, Ms. Brooks notified Dr. Peoples that she was re-filing her sexual discrimination charges against Earl Hill, and attached her letter of July 7, 1997. On March 20, 1998, she filed another formal complaint form, but detailed only the incidents that had occurred since her previous complaint. In addition, Ms. Brooks sent a letter to Marilyn Ray, the Interim Dean of the College of Education, informing her that she intended to continue the grievance process, specifically with regard to her termination. Ms. Brooks testified that by this time she had come to believe that Dr. Peoples and Coach Hill, who were good friends, were working together against her.[5] She also testified that since the time that Coach Hill had recommended to Chancellor Gex that she be terminated, she had cried repeatedly at work and more often at home.
Chancellor Peoples responded to Ms. Brooks' letter by requesting in writing that Ms. Brooks clarify the nature of her grievance. In response, Ms. Brooks' new attorney sent a letter saying her grievance was "sex discrimination and harassment based upon her gender, female, perpetrated by the Athletic Director, Earl R. Hill."
On May 29, SUNO notified Ms. Brooks that her employment as coach of the women's basketball team would also end June 30, 1998, when her contract expired. After receiving this letter, Ms. Brooks sent Dr. Peoples a letter informing him that she had been trying unsuccessfully to find out what procedures she needed to follow in order to continue the grievance process with regard to her termination.
On June 3, a grievance committee appointed by Chancellor Peoples held a hearing *1209 regarding the third complaint filed by Ms. Brooks. Ms. Brooks, her attorney, and Coach Hill were present. Ms. Brooks was given the opportunity to make a statement, but did not do so. According to Ms. Brooks, the committee limited its consideration to the two recent coaching-related incidents that were detailed in her third complaint. She testified that she was surprised by this approach because she thought that her previously withdrawn complaints were revived when she filed the third complaint. She also hoped to be allowed to discuss her termination. She testified on cross-examination that she did not know the difference between sexual harassment and gender discrimination. She stated that her attorney was not allowed to speak at the hearing, but only to advise her. Ms. Brooks did not bring any witnesses with her. She admitted that she had not read the rules for the hearing format, and she mistakenly believed that the committee would contact the witnesses she had listed in her complaint. Coach Hill spoke in his own defense at the hearing. At the conclusion of the hearing, the committee found that the evidence did not support the charge of discrimination.
Ms. Brooks received a letter dated June 4, 1998, informing her of the committee's decision. In another letter also dated June 4, 1998, Interim Dean Marilyn Ray responded to Ms. Brooks' request to continue the grievance process. In that letter, Dr. Ray stated that Dr. Patricia Harris, the Vice Chancellor for Academic Affairs, had determined that Ms. Brooks was not entitled to use the grievance process because she had been given a position as a "Temporary Instructor for one year, ending June 30, 1998." On June 15, 1998, Ms. Brooks wrote Dr. Peoples saying she disagreed with the grievance committee's ruling, and she was appealing the decision to Dr. Leon Tarver, the president of the Southern University System. In her letter she noted that she was not allowed to discuss her termination as coach and instructor before the committee. She also reminded Dr. Peoples that he had agreed not to retaliate against her in exchange for her dismissing her charges in July, 1997, and also that he had assured her at that time that both he and Coach Hill understood it would take two to three years for her to develop a winning program. Finally, Ms. Brooks expressed disappointment that despite her having achieved a winning season, as defined by their mutual agreement, in 1997-1998, she had nevertheless been retaliated against.
On cross-examination, Ms. Brooks admitted that she did not mention SUNO's alleged promise to retain her for three years in any of her formal complaints or in the federal EEOC complaint she filed. She also admitted that her third complaint did not detail any sexual harassment issues, but stated that she believed the second complaint, a copy of which she had attached to the third complaint, had been revived and was a part of the third complaint. Finally, she testified that she believed the grievance committee was biased against her, although she could not say which members were biased. Ms. Brooks also believed that Chancellor Peoples had hand-picked the members of the committee, rather than using a standing faculty committee that already existed to hear grievances.[6] In support of this contention, plaintiff introduced a March 22, 1998, letter from Dr. William Stewart to Chancellor Peoples in which Dr. Stewart declined to serve on the "Interim Faculty-Staff *1210 Grievance Committee" for the reason that it would be a conflict of interest for him to serve on a committee that duplicated the functions of a standing committee of faculty government.
Other witnesses presented by the plaintiff at trial confirmed Ms. Brooks' testimony concerning Coach Hill's behavior. Charles Jones, former trainer for SUNO's track and field coach, testified that he heard Coach Hill ask Jean Brooks to go out to dinner with him several times after games, but Ms. Brooks always refused. He also testified that Coach Hill once said Ms. Brooks should be wearing a negligee. Mr. Jones further related that twice he found Ms. Brooks crying in her office and asked why. The first time she said Coach Hill had asked her to go to bed with him and indicated that her job was at stake; the second time Ms. Brooks related that Coach Hill had said he would terminate her. Mr. Jones described the relationship between Coach Hill and the plaintiff in 1996 to 1997 as being "totally hell."
Carolyn Wicker, the secretary for the Athletic Department from July of 1997 until February of 1998, testified that Coach Hill treated Ms. Brooks very differently from the way he treated the other assistant coaches, who were all male. Specifically, he hollered at Ms. Brooks in front of her students, slammed doors in her face, never included her in meetings with the other assistant coaches, refused to meet with her when she asked, and often waited until the last minute to sign her requisition forms, so that she had difficulty obtaining her funds in time for away games. Ms. Wicker sometimes found Ms. Brooks crying in the ladies room. According to Ms. Wicker, Coach Hill eventually began belittling her for being close to Coach Brooks; according to Ms. Wicker, "He added me to his list." Ms. Wicker resigned after Coach Hill suggested she should find another job. She testified that she wanted to put in her letter of resignation that she was leaving because of the way Coach Hill treated women, but someone in the SUNO personnel office convinced her that it would not be appropriate.
Gerald Kimble, a retired coach at SUNO who had taught both Jean Brooks and Earl Hill in high school, testified that he had initially recommended to Coach Hill, a good friend of his, that he hire Jean Brooks as coach of the female basketball team. However, he later heard that Coach Hill and Ms. Brooks had developed personality conflicts. Mr. Kimble testified that at one point, Coach Hill came to him and told him Ms. Brooks had filed a written complaint against him. Coach Hill told Mr. Kimble that if Mr. Kimble could get Ms. Brooks to rescind her complaint, he would stop bothering her, would let her run her program, and would not fire her. Mr. Kimble agreed to try, and he then called Chancellor Peoples and got his permission to intercede. Mr. Kimble said he promised Ms. Brooks she would not be fired if she withdrew the complaint, which she agreed to do, but he denied that he promised her any specific amount of time, such as three years, or that such was ever mentioned by Coach Hill or Chancellor Peoples. Several months later, Ms. Brooks called Mr. Kimble and told him she had been fired anyway. He noted that in actuality, she had been notified that her contracts would not be renewed beyond the 1997-1998 year. Mr. Kimble also testified that Ms. Brooks had mentioned that Coach Hill had made some passes at her, but she never indicated these had anything to do with her termination; instead, she indicated to him that she had been terminated because she had not won enough games. Mr. Kimble stated that all coaches know they have to win, and confirmed that Coach Hill had written Chancellor Gex a memo in January, 1997, in which Coach Hill expressed his concern about the direction *1211 of the women's basketball program. Mr. Kimble also testified that Coach Hill and Dr. Peoples, who became Chancellor after Dr. Gex, were "real, real good friends" and had been friends for years before Dr. Peoples became Chancellor.
Lagabe Williams, a former assistant track coach at SUNO, confirmed that Coach Hill and Dr. Peoples were good friends.
Dr. Lawrence Gulley, former Interim Dean of the College of Business, explained the "Low Completer" program.[7] This was a program initiated by the Board of Regents to phase out certain majors that were not graduating many students. One of the majors to be phased out by not accepting any new students was Physical Education. However, according to Dr. Gulley, the low completer status of the major did not affect the "service courses" in that major, which are those courses all students are required to take. Dr. Gulley also testified that the position of instructor, although untenured, was a full-time, permanent, year-to-year position. He testified that the general policy at SUNO was that if an instructor was going to be retained for another year, no paperwork or recommendation from the instructor's supervisor was necessary.
The plaintiff introduced the deposition of Dr. Artis Davenport, who was employed by SUNO from 1961 until he retired in January, 1999. In 1971 he became a full professor and was made Chairman of the Health and P.E. Department, which position he held until retirement. During Jean Brooks' tenure at SUNO, she taught nine to ten hours per semester in his department; Dr. Davenport testified that one had to teach six hours to be considered a full-time faculty member. Ms. Brooks taught service classes that all SUNO students were required to take, as opposed to higher level classes generally taken only by Physical Education majors. Dr. Davenport stated that he never recommended that Ms. Brooks be terminated as an instructor, and identified a memo he wrote to Dr. Patricia Harris in that regard. Dr. Davenport testified that Coach Hill wanted Ms. Brooks fired, and that Coach Hill and Chancellor Peoples were very close, so close that Coach Hill generally got whatever he wanted. Dr. Davenport stated that sometime during the 1997-1998 year, Coach Hill came to his office and when they were alone, asked Dr. Davenport to fire Ms. Brooks. Dr. Davenport said his response to Coach Hill was: "Do it yourself." Sometime later, Coach Hill told Dr. Davenport he was going to get her fired. Dr. Davenport stated that the eventual termination of Ms. Brooks' instructor position did not follow the general policy of SUNO because it was not initiated by Dr. Davenport himself, who was chairman of the department in which Ms. Brooks taught. Finally, Dr. Davenport testified that the Health and Physical Education major was discontinued in 1996 because of its low completer status, but that its discontinuation did not affect the classes Ms. Brooks taught, which were all service courses.
Plaintiff also introduced the deposition of Sonja McCarthy, an assistant professor in the Health and P.E. Department. Ms. McCarthy confirmed that she had resigned as the volunteer activity director of a summer youth sports program at SUNO because of the difficulty she had encountered working with Earl Hill, whom she had described in the letter as insensitive, arrogant and authoritarian.
*1212 Dr. Ding Wu Kuo, Dean of the College of Arts and Social Sciences from 1987 to 2001, testified that it was normal policy at SUNO for the department head to determine which instructors were to be retained in his or her department. In his twelve years as Dean, Dr. Kuo said he had followed the recommendation of the department head in all cases except one. He also stated that of eight majors that were designated as low completer in his college, he had recommended that SUNO retain all the instructors, and that only one was let go.
Dr. Marilyn Ray testified that she was in her 36th year as a Professor of Education at SUNO, and she served as Interim Dean of the College of Education from 1997 to 1998. She identified the by-laws of the university, which state: "All personnel actions relating to faculty and other members of the academic staff shall be initiated by the employee's immediate supervisor...." Dr. Ray confirmed that Ms. Brooks' immediate supervisor was Dr. Davenport. Dr. Ray herself never recommended that Ms. Brooks' employment as an instructor be discontinued, nor did she recall having received any such recommendation from Dr. Davenport. Dr. Ray did not anticipate that Ms. Brooks' contract would not be renewed. The witness did not recall having received a letter addressed to her from Ms. Brooks concerning Ms. Brooks' intention to continue the grievance process with regard to her termination. Dr. Ray did not recall having spoken with Ms. Brooks concerning a grievance. However, she testified that an instructor at SUNO who received a notice that her contract was not going to be renewed is entitled to file a grievance. She testified that Ms. Brooks was a member of the SUNO faculty, as that term is defined in the faculty handbook ("a full time member of the instructional staff with the rank of instructor or above"). She also confirmed that, according to the handbook, all faculty members are entitled to the grievance process. Dr. Ray testified that she received from Ms. Brooks' attorney a packet of information concerning her grievance in June or July of 1998. Dr. Ray identified a letter she wrote to Ms. Brooks explaining that she had contacted Dr. Patricia Harris about the grievance, but Dr. Harris had responded that Ms. Brooks was not entitled to the grievance process because of her position as a temporary instructor. According to the letter, Dr. Ray's attempts to contact Ms. Brooks by telephone had been unsuccessful, and she was therefore informing Ms. Brooks in writing that she would be unable to meet with her. Finally, Dr. Ray identified a vacancy announcement for Ms. Brooks' instructor position and confirmed that the notice did not indicate the position was temporary.
Ms. Barbara Haynie, who served as the plaintiff's attorney from the time she fired her first counsel until late June, 1998, testified that she responded to Dr. Peoples' request that Ms. Brooks clarify her third complaint. Although Ms. Haynie thought she had clearly indicated by using the term "harassment" that the complaint included sexual harassment, Dr. Peoples' response ignored the sexual harassment issue and treated the claim as if it was for gender discrimination alone. Ms. Haynie attended the June 3 grievance committee hearing with Jean Brooks. The witness corroborated Ms. Brooks' testimony concerning the hearing, stating that Ms. Brooks was told in the beginning that the discussion would be limited to two specific incidents that had occurred on a team trip, which Ms. Brooks had detailed in her most recent complaint. Ms. Haynie was not allowed to speak, except to advise her client. According to Ms. Haynie, the only persons who spoke were the committee chairman and Coach Hill. Ms. Haynie testified she did not file a new sexual harassment complaint because she assumed the *1213 previous one was still viable and perhaps would be addressed at a subsequent hearing. On approximately June 25, Ms. Haynie got a letter from Chancellor Peoples to which was attached a form Ms. Brooks could use to file a complaint regarding her termination, but at about that same time Ms. Haynie had to drop Ms. Brooks as a client, so she referred her to another attorney.
Dr. Robert Gex testified that he was Chancellor of SUNO for eight years, until June 30, 1997. He stated that it was common to combine an instructor position with a coaching position, as in the case of Ms. Brooks, in order to offer the individual a decent salary. Dr. Gex identified letters from two former SUNO students, Orlinda Stansberry and Alicia Porter, who each had asserted a sexual harassment complaint against Earl Hill during Dr. Gex's tenure. Dr. Gex stated that he had appointed a committee to investigate those claims, according to SUNO policy. He testified that in 1993, the Board of Regents had initiated a study of "low completer" programs, which were defined as majors that had graduated fewer than eight students per year over the past five years; to comply, SUNO had to give a rationale for continuing to offer each of those majors. Dr. Gex confirmed that he had once written in a letter that Jean Brooks was a "class lady" who had brought dignity to SUNO's women's basketball program; the witness said he still believed that. Dr. Gex identified a letter he wrote in 1994 in which he referred to Ms. Brooks as a "full-time faculty member;" the witness stated, however, that his characterization was in error because Ms. Brooks taught only two classes per semester. He testified that Ms. Brooks held two part-time positions, one as a coach and one as a teacher, and that the two jobs could not be separated, as they had been put together for a reason. He acknowledged that Ms. Brooks was not eligible for a three-year extension of either contract. Dr. Gex also acknowledged that Coach Hill had told Ms. Brooks on at least two occasions that he did not want any further communication from her on a specific subject; Dr. Gex stated, however, that Ms. Brooks could have continued to communicate with him anyway, and he (Dr. Gex) would not have considered such to be insubordination. Dr. Gex received a letter from Coach Hill on January 6, 1997, recommending that Ms. Brooks be suspended for one game for her failure to adhere to Coach Hill's two-hour time limit on practices. Dr. Gex also testified that some of Ms. Brooks' players had come to him and complained that her practices were too long. He approved Ms. Brooks' suspension. He noted that in the January 6th letter, Coach Hill had also expressed his concern about the direction of the women's basketball program. Dr. Gex confirmed that shortly thereafter, Coach Hill recommended to him that Ms. Brooks be terminated as basketball coach.
Dr. Gex told Ms. Brooks he had not decided whether to accept the recommendation. He also admitted having told her that he believed she should have more autonomy if she was to be held accountable for her team's record. He denied, however, that he had ever agreed to address her allegations against Coach Hill in exchange for Ms. Brooks' withdrawal of her initial formal complaint. Dr. Gex said he met with Ms. Brooks, her attorney, SUNO's attorney and Earl Hill in June, 1997, solely to "clarify" for Ms. Brooks the issues she had raised. He stated that he decided at that meeting that Ms. Brooks would be given a contract extension for the 1997-1998 year, after which she would be terminated. He indicated that his decision was based upon the performance of the women's basketball team, and that the one-year extension was a courtesy in order to allow Ms. Brooks time to find another job. He first testified that he was sure he had told Ms. Brooks this, but later said he *1214 did not remember when "that came out," saying that he did not tell her at the meeting itself. Dr. Gex admitted that there was no mention of this "terminal year" in his June 30th memorandum to all parties summarizing the agreement reached at the meeting. He testified that he sent a copy of his memorandum to Ms. Brooks' attorney two weeks prior to June 30th, and during those two weeks, he never received any communication from the attorney indicating Ms. Brooks was dissatisfied with any aspect of the agreement. He testified that Ms. Brooks' attorney had agreed verbally to every point listed in the memorandum. As Dr. Gex left his job at SUNO on June 30th, he knew nothing further about the Brooks matter, but he believed SUNO had honored its commitment to her by keeping her on through the 1997-1998 year.
Dr. Gerald Peoples testified that he served as the Chancellor of SUNO from July 1, 1997, through February of 2000. He testified that he and Coach Hill had been friends since 1992, and that he generally talked to Coach Hill about two to three times per week. One week after Dr. Peoples became Chancellor, he got a letter from Ms. Brooks saying she was filing sex discrimination / sexual harassment charges against Coach Hill.[8] He referred the claim to the Personnel Director, Ms. Caiton. He recalled receiving a phone call from Gerald Kimble and giving him permission to try to "patch things up" between Hill and Brooks, but he did not know what Mr. Kimble said in order to accomplish this. Later that summer, Dr. Peoples met with Ms. Brooks, Coach Hill and Dr. Stevenson, SUNO's Executive Vice-Chancellor, to discuss Ms. Brooks' concerns about the athletic program. They agreed that Ms. Brooks would continue to be employed for another year, and that she would continue to report to Coach Hill, but Coach Hill would refrain from interfering with her program. They also discussed the importance of Ms. Brooks having a winning season, and the fact that she needed time to get her program going. Dr. Peoples denied, however, that any specific time frame was discussed, and specifically denied ever having consented to giving Ms. Brooks three more years to improve her team's performance; nor was there any discussion about the 1997-1998 year being her final year at SUNO. Dr. Peoples recalled that Ms. Brooks was concerned that Coach Hill had been trying to get her fired and had in fact recommended such to Dr. Gex. Dr. Peoples assured Ms. Brooks that there would be no retaliation against her, and Coach Hill agreed. There was no agreement whereby Ms. Brooks promised to drop her charges; however, after the meeting disbanded, Dr. Peoples received a letter from her saying she was withdrawing the complaint. Dr. Peoples testified that the renewal of Ms. Brooks' teaching contract for another year, of which she was notified two days later, was merely routine. Dr. Peoples believed those letters were sent to all instructors each year. He was surprised to learn that Ms. Brooks had testified it was the first time she had received such a letter.
Dr. Peoples testified that in February, 1998, he received a letter from Dr. Harris, Vice-Chancellor for Academic Affairs, stating that five instructors, including Ms. Brooks, had not been recommended for continued employment.[9] On February *1215 28th, he wrote a letter to each of those individuals informing each that his or her contract would not be renewed. Dr. Peoples testified that he made the decision not to renew Ms. Brooks' contract based primarily upon Dr. Harris' recommendation, considering also that SUNO needed to reduce its faculty due to the low completer programs and budget constraints. Dr. Peoples acknowledged that Dr. Davenport, Ms. Brooks' immediate supervisor, wrote a letter three days later saying he would have recommended Ms. Brooks for continued employment if he had been asked. The witness further acknowledged the policy statement in the faculty handbook saying that all personnel actions shall be initiated by the employee's immediate supervisor, but stated his belief that there were exceptions for temporary employees. He believed that Dr. Harris had the authority to make recommendations concerning the discharge of faculty. After being shown the faculty handbook, however, he acknowledged that it did not specifically give the Vice-Chancellor for Academic Affairs that authority, although it did give such authority to the college deans, as well as to the department chairmen. Dr. Peoples denied that the non-renewal of Ms. Brooks' teaching contract constituted retaliation or that it was a violation of his prior agreement not to retaliate against her.
After Ms. Brooks re-filed her charges against Coach Hill, Dr. Peoples appointed an "Interim Faculty Staff Grievance Committee" to investigate her grievance. When confronted with Dr. Stewart's letter refusing to serve on that committee because it duplicated the functions of a standing committee of faculty government, Dr. Peoples stated that Dr. Stewart was wrong  that there was no standing committee. He stated that the faculty committee in question was not a standing committee recognized by the Southern University system, and that he, as Chancellor, had the authority to appoint a new committee. When asked about his letter to Ms. Brooks requesting that she clarify her charges, Dr. Peoples said once he received Ms. Haynie's response, he understood that Ms. Brooks was alleging both sex discrimination and sexual harassment.[10]
Dr. Peoples acknowledged that by April 3, 1998, he was aware that Ms. Brooks had also filed an EEOC charge against SUNO. On May 27th, he sent Ms. Brooks a letter notifying her that her contract as head women's basketball coach would not be renewed beyond its June 30, 1998, expiration date. Dr. Peoples stated that he took this action based upon the recommendation of Coach Hill. He cited two reasons for Coach Hill's recommendation: (1) It was a part-time position and because Ms. Brooks had lost her teaching position, her coaching salary ($4,000) was not sufficient to enable the university to withhold from Ms. Brooks' check any amount of advances for away games for which she might not turn in receipts; and (2) Ms. Brooks' win / loss record. With regard to the first reason, Dr. Peoples admitted that SUNO had other coaches who were not also teachers. When asked about the fact that Ms. Brooks had achieved a winning season in 1997-1998, Dr. Peoples said his understanding from the meeting in his office was that Ms. Brooks had to achieve a winning season to be considered for re-employment, but a winning season would *1216 not guarantee that she would be re-employed.
Dr. Peoples testified that Ms. Brooks, as a faculty member, clearly had the right to file a grievance regarding the termination of her employment. He therefore had no explanation for Dr. Harris' letter to Dean Ray stating that Ms. Brooks had no right to file such a grievance. Dr. Peoples acknowledged that the letter indicated it was copied to him. Dr. Peoples also acknowledged having received a letter from Jean Brooks complaining that she had not been allowed to discuss her termination at the June 3rd grievance committee hearing. He did not recall what action he took, if any, after he learned that Ms. Brooks had not been allowed to continue the grievance process with regard to her termination. He stated, however, that the June 3rd hearing did not concern Ms. Brooks' termination. He indicated that although she was following the correct process with regard to asserting a grievance as to her termination, Ms. Brooks had the option of continuing that process beyond Dr. Harris' refusal; Ms. Brooks, however, failed to do so. Dr. Peoples stated that after Dr. Harris, the next step up the chain of command would have been himself as Chancellor, then Dr. Tarver, the President of the Southern University system. Dr. Peoples admitted, however, that Dr. Ray's letter to Ms. Brooks informing her of Dr. Harris' decision did not indicate that Ms. Brooks had any further recourse. Finally, Dr. Peoples reiterated that he did not retaliate against Ms. Brooks, nor did he believe that Coach Hill's recommendation to terminate her was retaliation. His basis for this belief was that Coach Hill had not mentioned retaliation to him.
Dr. Patricia Harris, SUNO Vice-Chancellor for Academic Affairs, testified that the Health and P.E. program was one of the low completer programs; therefore, by 1997, the head of the Health and P.E. Department (Dr. Davenport) was no longer referred to as "Chairman," but rather as a "coordinator." The Health and P.E. Department was part of the College of Education, whose Dean at the time was Dr. Marilyn Ray. Dr. Harris testified that in 1998, she did not renew the teaching contract of any instructor in a low completer program who had neither applied for promotion to assistant professor nor had been recommended for retention by his or her department head. Dr. Harris discontinued Ms. Brooks because she did not receive a recommendation from Dr. Davenport that Ms. Brooks be retained as an instructor. Besides Jean Brooks, she did not renew the contracts of four other instructors that year, three in the English and Print Journalism Department and one in the Foreign Languages Department. Of those four, one was recommended for termination by his department head and the other three were instructors about whom Dr. Harris had received no communication from the department head. Dr. Harris testified that she had informed the Deans of each college that she would need recommendations from the department heads concerning instructors. Dr. Harris said some of the recommendations she received were verbal. There were no written recommendations produced as evidence. Dr. Harris admitted that she had retained one instructor without a recommendation even though he taught in a low completer program, the Technology Department. Her explanation for this discrepancy was that it is easier to hire P.E. teachers than technology teachers. Finally, Dr. Harris testified that Ms. Brooks had no right to file a grievance regarding the non-renewal of her teaching contract, as she was hired on a year-to-year basis.
Earl Hill testified that he had been the Athletic Director and head men's basketball coach at SUNO since 1991. He had hired Ms. Brooks as coach of the women's *1217 basketball team. Coach Hill denied that he ever was romantically interested in her, and he testified that he had never asked her to go out to dinner with him; he indicated that Mr. Charles Jones' testimony to the contrary was motivated by bitterness because he had fired Mr. Jones. Coach Hill denied having made any sexually suggestive remarks to Jean Brooks. He denied each specific allegation of her sexual harassment complaint, testifying that he never said any of the things to her that she claimed he said. Coach Hill testified that he received Ms. Brooks' November 4, 1996, letter asking to meet with him, but he did not honor her request because the opportunity never presented itself, and he had more urgent matters to take care of. He also denied the allegations made by the two former work-study students, Orlinda Jackson and Alicia Porter, in their testimony. Coach Hill said he never told Carolyn Wicker that she would do fine working in his department as long as she did not get close to "the enemy," and denied her testimony that he had slammed doors in Ms. Brooks' face and yelled at her. He also denied that he ever asked Gerald Kimble to mediate between him and Jean Brooks. He testified that he ordered Ms. Brooks to wear a special practice shirt because she had been wearing blouses with spaghetti straps. He further testified that several of Ms. Brooks' players had complained to him about her three-hour practices. He stated that even after she was told she had to limit her practices to two hours, Ms. Brooks never stopped holding three-hour practices; he denied that her three-hour practices were held only on weekends.
Coach Hill denied that he had ever asked Dr. Davenport to fire Ms. Brooks, or told him that he would get her fired. He stated that he and Dr. Davenport were not on the best of terms because he had once denied Dr. Davenport's track team the opportunity to go to the national championship because Dr. Davenport had spent all of his budgeted money. Coach Hill also denied that he had asked Chancellor Gex to fire Jean Brooks, but said he did write the Chancellor and ask that Ms. Brooks' contract not be extended because of her losing record. Instead, Chancellor Gex had a meeting with the parties which resulted in a written stipulation that Ms. Brooks would be the coach for another year. When asked about the issue of mandatory study hall for Ms. Brooks' players, Coach Hill said that Jean Brooks had challenged almost every recommendation he had made to her as her supervisor. Coach Hill appreciated that Ms. Brooks cared about her athletes, but thought it was awful that she was not having any success as the women's basketball coach. Despite the statement in Dr. Gex's memorandum to the contrary, Coach Hill testified that he had not agreed that he should have required all coaches to wear the uniform practice shirt because Ms. Brooks was the only coach who had been wearing inappropriate attire. Coach Hill testified that it was his understanding after the meeting in Dr. Gex's office that the 1997-1998 year would be Jean Brooks' final year, because he as her supervisor had recommended that her contract not be extended, but Dr. Gex had decided to give her one more year. Coach Hill admitted that the topic was not discussed in the meeting, and that Dr. Gex's memorandum summarizing the meeting did not say anything about 1997-1998 being her final year. Coach Hill stated that the memorandum defined what would constitute a successful season because Ms. Brooks had asked for a definition, not because there was any agreement that she would be retained if she achieved a successful season. Coach Hill testified that he did not know why Ms. Brooks dropped the charges she had filed against him shortly after the meeting with Dr. Gex.
*1218 Dr. Gex retired after he wrote the memorandum regarding the meeting, and Dr. Peoples took over. Coach Hill was aware that Ms. Brooks had re-filed her charges against him. Coach Hill confirmed that he and Dr. Peoples were friends and saw each other socially. He also acknowledged that he met with Dr. Peoples, Ms. Brooks, and Dr. Stevenson to clarify Ms. Brooks' working status as a coach. In that meeting Coach Hill agreed that he would let Ms. Brooks run her program and he would not retaliate against her. They discussed the importance of her having a winning season, but never mentioned that she would need two to three more years to get her program going. Coach Hill admitted that during Jean Brooks' last year at SUNO, he declined to speak to her directly and only communicated with her in the presence of a third party; he believed this policy was in the best interest of the university.
Coach Hill testified that during Ms. Brooks' final year at SUNO, she deliberately disobeyed him by allowing her niece to ride the team bus to an away game without his knowledge, despite the fact that she had been denied permission to do so. He denied that he had ever purposely made her team late for a game. He testified that his primary reason for recommending in 1998 that Ms. Brooks' contract not be extended was her overall losing record. However, Coach Hill admitted that in his June 25, 1998, letter to Dr. Peoples he had detailed several other reasons: Ms. Brooks earned more money than other teacher/coaches with better credentials and more experience; Ms. Brooks had been insubordinate, citing the incident where her niece rode the team bus; and Ms. Brooks had "made false and unwarranted charges of sex and gender discrimination without true cause." Coach Hill testified that he never was upset about what he considered to be false and unfair charges being lodged against him by Ms. Brooks; rather, he included that language in his letter in order to document her insubordination.
Elston King testified that he was the assistant men's basketball coach at SUNO during Ms. Brooks' tenure there; after Ms. Brooks was terminated, Mr. King became head women's basketball coach. Mr. King also assisted Ms. Brooks in her second year as coach. Later, when she had only student assistants, Mr. King asked Ms. Brooks if she needed his help, and she said yes. However, when he asked Coach Hill if he could help her, Coach Hill told him that he could only do so on his own time. Because Mr. King had a lot of other duties, he decided not to help Ms. Brooks. Mr. King also testified that in his observation, the women's team exceeded their two-hour scheduled practice time about two to three days per week, and that they sometimes practiced for three hours on weekends. Mr. King never heard Coach Hill ask Ms. Brooks out on a date. The witness confirmed that Ms. Brooks' niece rode the team bus to an away game after Coach Hill and the Chancellor had denied Ms. Brooks' request for permission to bring her on the bus.
Sherrye Carradine, executive assistant to the Chancellor of SUNO, testified that the reason SUNO gave for Ms. Brooks' termination in its response to the EEOC charge was the discontinuance of the Health and P.E. program due to its low completer status and Ms. Brooks' rank as an instructor in that program.
SUNO presented only two witnesses in defense of Ms. Brooks' claims: Barbara Barabino and Wesley Bishop. Ms. Barabino testified that she was a SUNO alumnus who had voluntarily assisted Ms. Brooks' during her first year of coaching, 1992, but had quit because Ms. Brooks would not allow her to do anything but stand around in the gym. After she quit as Ms. Brooks' *1219 assistant, she assisted Coach Elston King for five years. Ms. Barabino testified that she never saw Coach Hill harass or intimidate women in the Athletic Department.
Wesley Bishop testified he was the SUNO professor who chaired the grievance committee that heard Ms. Brooks' complaint on June 3, 1998. He testified that SUNO had anti-discrimination and anti-harassment policies in place. He stated that a copy of the hearing format rules had been made available to Ms. Brooks. Under those rules, Ms. Brooks was allowed to make a statement and to bring witnesses in her behalf. However, she declined to speak and presented no documentary evidence or witnesses. Mr. Bishop testified that Ms. Brooks' attorney was given a chance to speak, but declined to do so. The first question Ms. Brooks was asked was what type of claim she was bringing, to which she responded: "Gender discrimination." The committee believed the grievance before them had nothing to do with sexual harassment or non-renewal of Ms. Brooks' contract, only gender discrimination, especially as related to two incidents that occurred on one specific weekend; Ms. Brooks had detailed those incidents in her complaint, both of which involved a particular away game. Coach Hill brought documentation showing that the men's and women's basketball teams had been allocated the same amount of money, but because Ms. Brooks had given her players more money than she should have, she did not have enough money remaining to pay the hotel bill. In her complaint, Ms. Brooks had attributed the episode to Coach Hill's failure to communicate to her what the money was for. The other incident had to do with Coach Brooks' having brought her niece on the bus. The committee decided that the evidence presented did not substantiate a claim of gender discrimination. Mr. Bishop denied that any member of the committee was biased against Ms. Brooks.
At the conclusion of the evidence, SUNO's attorney moved for a directed verdict on liability, which the trial court denied.

D. Discussion of the Law and Application of the Law to the Evidence

1. Sexual Harassment
The plaintiff's sexual harassment claim falls within the ambit of La. R.S. 23:1006, which prohibits intentional discrimination on the basis of race, color, religion, sex or national origin. Because the Louisiana statute is similar in scope to the federal anti-discrimination prohibitions in Title VII of the Civil Rights Act of 1964, Louisiana courts have routinely looked to the federal statute for guidance in determining whether a valid claim for sexual harassment exists. Alphonse v. Omni Hotels Management Corp., 94-0157, p. 2 (La.App. 4 Cir. 9/29/94), 643 So.2d 836, 838; Craven v. Universal Life Ins. Co., 95-1168, pp. 5-6 (La.App. 3 Cir. 3/6/96), 670 So.2d 1358, 1362.
There are two different types of sexual harassment claims that can be asserted under the federal law: "quid pro quo" harassment and "hostile environment" harassment. Alphonse, supra, p. 2, 643 So.2d at 838; Craven, supra p. 6, 670 So.2d at 1362. Quid pro quo harassment exists when an employer implicitly or explicitly has conditioned a job, a job benefit, or the absence of a job detriment upon the employee's acceptance of sexual conduct. Hostile environment harassment refers to the situation in which verbal or physical conduct has created an intimidating, hostile, or offensive work environment. Craven, supra. It is apparent from the record that the claim asserted by Ms. Brooks' is based upon hostile environment harassment.
*1220 To prevail in a hostile environment sexual harassment action against an employer, the plaintiff must prove five elements:
(1) the employee belonged to a protected group;
(2) the employee was subjected to unwelcome sexual harassment;
3) the harassment was based upon sex;
(4) the harassment affected a term, condition, or privilege of employment; and
(5) the employer knew or should have known of the harassment and failed to take proper remedial action.
Alphonse, supra, p. 2, 643 So.2d at 838-839. In the instant case, therefore, we must determine whether the jury was manifestly erroneous when it found that Jean Brooks established these five elements by a preponderance of the evidence.
The first requirement, that the plaintiff be a member of a protected class, is satisfied by the fact that Ms. Brooks is female. The second, third and fourth elements have each been jurisprudentially explained. Regarding whether the offensive behavior was unwelcome, the term "unwelcome" has been defined as "not solicited or desired by the plaintiff." Alphonse, supra, p. 3, 643 So.2d at 839. Considering the third requirement, that the harassment is based upon sex, this court has stated:
Courts have consistently held that sexual harassment need not take the form of sexual advances or of other instances with sexual overtones. Rather, any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII.
Alphonse, supra, pp. 3-4, 643 So.2d at 839 (citations omitted).
The fourth element, whether the harassment affected a term, condition, or privilege of the plaintiff's employment, has received much discussion in the courts. Quoting the United States Supreme Court, we stated in Alphonse:
(W)hen the workplace is permeated with "discriminatory intimidation, ridicule and insult, that is `sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated."
Id. p. 4, 836 So.2d at 839 (quoting Harris v. Forklift Systems Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).)
In general, hostile environment harassment is characterized by multiple and varied incidents of offensive behavior that cumulatively have the effect of creating a hostile working environment for the employee thus victimized. Craven v. Universal Life Ins. Co., supra, p. 7, 670 So.2d at 1363. The type of conduct constituting harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, where the purpose or effect of such conduct is to unreasonably interfere with the victim's work performance or to create an intimidating, hostile, or offensive work environment. Craven, pp. 6-7, 670 So.2d at 1363 (quoting Brown v. Vaughn, 589 So.2d 63, 65 (La.App. 1st Cir.1991)). In determining whether a work environment is discriminatorily abusive, the trier of fact must look at all the circumstances. Relevant factors to consider include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance; *1221 and (5) the effect on the employee's psychological well-being. Craven, p. 7, 670 So.2d at 1363 (citing Harris v. Forklift Systems, supra); Alphonse, p. 4, 643 So.2d at 839. The psychological effect on the employee, while a factor, is not by itself determinative. As the U.S. Supreme Court pointed out in Harris, the proper standard is somewhere between the "mere utterance of an epithet which engenders offensive feelings in the employee" and conduct that leads to a nervous breakdown. A hostile work environment, even if it does not seriously affect an employee's psychological well-being, may detract from the employee's job performance, discourage the employee from remaining on the job, or keep the employee from advancing in his or her career. Alphonse, supra, p. 4, 643 So.2d at 840 (citing Harris, supra).

2. Retaliation
To establish a prima facie case for retaliation, the plaintiff must prove by a preponderance of the evidence that: (1) she engaged in an activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse employment action. Hanley v. Doctors Hospital of Shreveport, 35,527, p. 14 (La.App. 2 Cir. 6/6/02), 821 So.2d 508, 519. According to the U.S. Supreme Court, a tangible employment action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998). Besides discharges and demotions, actions that have been deemed adverse employment actions by the federal courts considering retaliation cases include the refusal to renew a consulting agreement (Glass v. IDS Financial Services, 778 F.Supp. 1029 (D.Minn.1991)); the employer's breach of a prior agreement to pay employee's moving expenses (West v. Marion Merrel Dow, Inc., 54 F.3d 493 (8th Cir.1995)); and a reduction in pay and opportunities (Edwards v. Board of Regents of the University of Georgia, 2 F.3d 382 (11th Cir.1993)).
Once the plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. If the defendant introduces evidence, which, if true, would permit the conclusion that the adverse action was non-discriminatory, the plaintiff/employee assumes the burden of establishing that the reason or reasons given were a pretext. To satisfy this burden, the plaintiff must show that "but for" the protected activity, the adverse employment action would not have occurred. Hanley, supra, p. 14, 821 So.2d at 519-520.

3. Analysis
After reviewing the record, we find no manifest error in the jury's determinations that Jean Brooks was subject to unwelcome sexual harassment from Earl Hill, which culminated in SUNO's non-renewal of her contracts of employment, and that SUNO's failure to renew those contracts was retaliation for Ms. Brooks' having filed claims of sexual harassment against her supervisor.[11] In the instant *1222 case, both the finding of sexual harassment and the finding of retaliation were inevitably based upon credibility determinations, which are uniquely the province of the jury. It is axiomatic that great deference is owed to the trier of fact when reviewing credibility determinations, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily upon the listener's understanding and belief of what is said. Therefore, where there is conflict in the testimony, reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own inferences are as reasonable. Alphonse v. Omni Hotels Management Corp., supra, pp. 1-2, 643 So.2d at 838.
The jury obviously believed the plaintiff's testimony that Earl Hill repeatedly asked her out and made sexually suggestive comments that were unwelcome and difficult for Ms. Brooks to handle in view of Mr. Hill's position as her immediate supervisor. Her testimony in this regard was corroborated by Charles Jones, who said he had witnessed such behavior. Similarly, Carolyn Wicker corroborated Ms. Brooks' testimony regarding Mr. Hill's unfair treatment of the plaintiff later on in her tenure, after Ms. Brooks had initiated a complaint against him. Dr. Gex testified that during his term as Chancellor, Coach Hill on at least two occasions told Ms. Brooks he would not accept any further communication from her on a certain subject, even though those subjects were presumably coaching-related. Dr. Gex nevertheless believed that Ms. Brooks could have continued to attempt to communicate with her supervisor regardless of his directives. In our view, it was not unreasonable for the jury to find that Mr. Hill's attitude created a hostile working environment for the plaintiff. The fact that the sexually harassing behavior ceased after Ms. Brooks filed her initial complaint, only to be replaced by other discriminatory treatment of the plaintiff which clearly affected her ability to do her job, did not make the plaintiff's work environment any less abusive.
We also cannot say it was unreasonable for the jury to disbelieve Mr. Hill's denials of the plaintiff's testimony, especially since Mr. Hill's testimony directly conflicted in key respects with the testimony of several witnesses besides the plaintiff. These witnesses included Charles Jones, Carolyn Wicker, Gerald Kimble and Dr. Davenport. Indeed, some aspects of Mr. Hill's testimony seem inherently suspect, such as his statement that he never honored Jean Brooks' initial request to meet with him to work things out between them because "the opportunity never presented itself." Considering the record as a whole, we cannot say the jury was clearly wrong in determining that Earl Hill's offensive behavior was sufficiently severe, pervasive and disturbing to Ms. Brooks to have created a hostile and abusively discriminatory work environment under the law.
With regard to retaliation, the plaintiff clearly was engaged in protected activity when she filed harassment and discrimination complaints against Earl Hill. Moreover, SUNO's argument that its failure to renew Ms. Brooks' contracts after six years of employment did not constitute an adverse employment action because they were year-to-year contracts is specious at best. We also cannot say the jury was manifestly erroneous in finding that the plaintiff established the third element of her case for retaliation, that a causal link existed between the protected activity and the non-renewal of her contracts. If believed, the testimony from Dr. Davenport that Earl Hill asked him to fire Ms. Brooks and when Dr. Davenport refused, promised to get her fired himself, was sufficient to establish a causal link in the jury's mind, especially when combined *1223 with numerous witnesses' testimony that Earl Hill and Dr. Peoples had a longstanding friendship.
Once a causal link was established, the burden shifted to SUNO to articulate a legitimate, non-retaliatory reason for the termination of Ms. Brooks' employment. Various members of the SUNO administration at the time, virtually all of whom were called by the plaintiff, articulated multiple reasons for the non-renewal of first Ms. Brooks' teaching contract, then her coaching contract. However, the numerous inconsistencies in the testimony of those witnesses calls into question the credibility of SUNO's explanation.
The reasons given for the termination of Ms. Brooks' teaching position included the low completer status of her program and the fact that her supervisor did not recommend that she be continued. Dr. Harris testified that she did not renew Ms. Brooks' contract because she taught in a low completer program and Dr. Harris had not received a recommendation from Ms. Brooks' department head that she be retained; Chancellor Peoples stated he terminated Ms. Brooks on the basis of Dr. Harris' recommendation. However, the head of Ms. Brooks' department, Dr. Davenport, testified that he was not aware of the need to recommend her, and that he had never before been asked for a recommendation during the five years Ms. Brooks' contract had been automatically renewed; therefore, once he found out about her termination, he wrote a letter to Dr. Harris stating that he would have recommended her for retention had he known. Corroborating his testimony is that of Dr. Gulley, who described the general policy at SUNO as being that if an instructor was going to be retained for another year, no formal recommendation from the instructor's immediate supervisor was necessary. Moreover, two other SUNO administrators, Dr. Kuo and Dr. Ray, indicated that the normal policy at SUNO was for that the non-renewal of an instructor's contract would be initiated by that instructor's immediate supervisor, usually the department chairman; this policy is actually stated in the SUNO faculty handbook.
Besides this seeming departure from general SUNO policy, the believability of the second reason asserted by SUNO, the low completer status of the Health and P.E. program, is also called into question by evidence showing that Ms. Brooks taught only service classes; these classes were required for all students and therefore presumably would not be affected by the low completer status of the Health and P.E. major.
One of the primary reasons given by SUNO for the failure to renew Ms. Brooks' coaching contract was the fact that she no longer held a teaching position; the other was her overall losing record as a coach. The evidence showed, however, that there were other SUNO coaches who were not also teachers. Moreover, with regard to Ms. Brooks' coaching record, it was reasonable for the jury to accept Ms. Brooks' testimony that her termination violated the tacit agreement made in her meeting with Dr. Gex that she would not be terminated if she achieved a winning season in 1997-1998, which she did. The written summary of the meeting is silent on this point. When considering this issue, the jury had to choose either to believe the plaintiff, to believe Dr. Gex, who stated that Ms. Brooks understood that the renewal of her contract for 1997-1998 was simply a courtesy to allow her time to find another job, or to believe Dr. Peoples, who indicated that Ms. Brooks' achievement of a winning season in 1997-1998 was important in order for her to be considered for further renewal of her contract, but *1224 was not a guarantee that it would be renewed.
Once SUNO asserted its reasons for terminating the plaintiff's employment, Ms. Brooks had the burden to show those reasons were a mere pretext for retaliation. The jury found that the plaintiff satisfied this burden. Perhaps the most compelling evidence of retaliation was Dr. Harris' decision, communicated to Ms. Brooks through Dr. Ray, that Ms. Brooks had no right to file a grievance because her employment was based upon a year-to-year contract. Every other SUNO administrator who addressed this issue, including Chancellor Peoples, confirmed that as a faculty member, Ms. Brooks clearly had the right to lodge a grievance with regard to the termination of her employment. Yet, despite his knowledge of Dr. Harris' erroneous decision, a decision which Dr. Peoples said he had no explanation for, he did nothing as Chancellor to overrule Dr. Harris; instead, Dr. Peoples testified that it was up to Ms. Brooks to continue to pursue her grievance beyond Dr. Harris' refusal to consider it. Therefore, although SUNO had in place a procedure to investigate grievances, the university never investigated the plaintiff's termination. Moreover, every witness who testified as to the grievance committee hearing that did take place confirmed that the hearing was strictly limited in scope to exclude the sexual harassment and termination claims, which the committee did not believe were being raised at that time. In view of this evidence, the jury reasonably could have believed that the plaintiff was justified in giving up her attempt to pursue her grievance through SUNO after she was notified by the Vice Chancellor of Academic Affairs that she was not entitled to a grievance.
Finally, although Earl Hill testified he did not recommend that Ms. Brooks' be terminated as retaliation for her assertion of harassment/discrimination claims against him, his June 25, 1998 letter to Dr. Peoples nevertheless cites Ms. Brooks' "false and unwarranted charges of sex and gender discrimination" as evidence of her insubordination. In summary, there is a wealth of evidence from which the jury could have reasonably concluded that SUNO did retaliate for the plaintiff's filing of charges against Earl Hill by terminating her employment. We therefore cannot say the jury committed manifest error by its finding of retaliation.

DAMAGES

A. Standard of review for JNOV
The trial court granted a JNOV on the issue of damages only, reducing the general damage award from $475,000 to $65,000. From the bench, the court indicated that the amount awarded by the jury was so abusively high that it seemed punitive in nature, although punitive damages were not at issue in the case.
As the Louisiana Supreme Court has stated, the standard of review for a JNOV is a two-part inquiry. First, the appellate court must determine whether the trial court erred in granting the JNOV by using the same criteria the trial judge does in deciding whether or not to grant the motion. Those criteria hold that a JNOV is warranted whenever the facts and inferences point so strongly and overwhelmingly in favor of the mover that reasonable jurors could not have arrived at a contrary verdict; however, if there is evidence opposed to the motion of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Then, if the appellate court determines that the JNOV was properly *1225 granted, the second part of the inquiry is to review the JNOV according to the manifest error standard as enunciated in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). See: Davis v. Wal-Mart Stores, Inc., XXXX-XXXX, pp. 4-5 (La.11/28/00), 774 So.2d 84, 89; Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832-834 (La.1991).

B. Discussion of the evidence
Jean Brooks testified that it had always been her dream to coach at a Division I college. After graduating from Grambling University and working on her Masters degree for a semester at the University of Iowa, Ms. Brooks returned to her home in Shreveport to help support her younger sisters, as her mother was deceased. Unable to find a job in Louisiana, Ms. Brooks accepted a high school teaching and coaching job in Las Vegas and moved to Nevada, where her sisters eventually joined her. She coached basketball, volleyball and track and field at the high school level for nine years, achieved a state championship in track and field, and was voted Coach of the Year three times. She then took a coaching job at Eastern Utah Junior College, accepting a cut in pay so that she could gain experience at the college level. She remained there for four years, and then left after she had a child because she needed more money. She returned to teaching and coaching at the high school level in the Clark County School District, where she had previously worked. She coached there from 1986 until 1992, when she received a phone call from Coach Kimble telling her of the opening at SUNO. She applied, was interviewed by Coach Hill and his committee over the phone, and was offered the job.
She had a good working relationship with Coach Hill at first, but it began to deteriorate around 1995 or 1996 after she had repeatedly refused his advances. Sometime in 1997 Coach Hill began giving her the "silent treatment." She cried three or four times at work and more often at home because her work environment had become hostile and unfriendly. She believed she had no recourse because Coach Hill and the Chancellor were working together. Ms. Brooks testified that during this time, she lost 20 to 25 pounds due to stress and she suffered hair loss. Once she learned her contracts at SUNO would not be renewed, she was humiliated, embarrassed, and had trouble sleeping. She no longer enjoyed watching basketball on television, formerly her favorite pastime. She confided her troubles to her brother, who lived out of town but who spoke with her frequently by phone and visited her twice a year.
In the summer of 1998, Ms. Brooks sent resumes to numerous colleges, but received only rejections. In August, she was hired by the Orleans Parish School Board and placed in a middle school. However, her employment was conditioned upon her passing the National Teacher's Exam within a year. Until she passed, she was only eligible to receive half pay, with the remainder reimbursed to her if she passed by June 4, 1999. For the first year, Ms. Brooks had to take a janitorial job at night in order to survive financially, as she was supporting her son and her teenaged niece, who lived with her. She also had to apply for food stamps, which was demeaning for her. She had to pay for books to study for the teacher's exam and the exam fee, which was $90 for each of four parts. She passed every part except the third part, which she failed three times. She finally passed Part 3, but was told it would be impossible to get the results to the School Board before June 5th. It was only then, after further inquiry, that Ms. Brooks learned she had been certified to teach in Louisiana all along because she had graduated from a Louisiana college, but the School Board had erroneously *1226 treated her as a Nevada transfer.
Ms. Brooks testified that during that first year, she was unhappy because she hated borrowing money from her friends and family, she had trouble sleeping, and she hated teaching in middle school because there was no discipline. She also missed coaching. After the first year, she was transferred to Sarah Reed High School, where she was still employed at the time of trial. Besides teaching, she coached volleyball her first year at Sarah Reed, and then began coaching basketball as well. She indicated she was happier teaching in high school than in middle school, but felt that she had lost her dream of coaching at the college level. The evidence showed that Ms. Brooks was making a higher salary at Sarah Reed than at SUNO, and therefore her total loss of income was only $8,000, which amount the trial court awarded her separately from the general damages.
Besides herself, the plaintiff presented three other witnesses on the issue of damages: Randy Williams, Richard Hilliard, and Dr. David Dunn. Randy Williams is Ms. Brooks' brother. He testified that he was very close to his sister Jean, who was his best friend. He was still living in Las Vegas at the time of trial. He said after his sister moved back to Louisiana to work at SUNO, he spoke with her about once a week and visited twice a year. Ms. Brooks was very upbeat, excited and happy when she moved to New Orleans, but her brother noticed a change in her demeanor about 1995 or 1996. She became depressed, worried and isolated. She confided in him concerning her problems dealing with Coach Hill. Her lowest point was in 1998, when she was fired. Mr. Williams visited his sister for a week in July or August of 1998. During his visit she stayed in bed most of the time, refusing to come out of her room or to go anywhere with him. She cried once or twice. She refused to watch basketball on television with him. She was very concerned about how she was going to pay her bills, and creditors were calling. Financially, she was not able to do the things she had been doing for thirty years. She became short-tempered with her niece and her son because she could no longer afford to pay for certain things they were used to having. Mr. Williams loaned her whatever money he could spare every month for approximately three to six months. He also testified that Ms. Brooks had lost a lot of weight and had trouble sleeping. According to Mr. Williams, Ms. Brooks was still stressed about her situation at the time of trial, although it had improved since she was terminated.
Richard Hilliard testified that he was a good friend of the plaintiff. He stated that Ms. Brooks changed from an outgoing person to a depressed one about 1997 because of the problems she was having with her supervisor, Coach Hill. Mr. Hilliard stated that Ms. Brooks was devastated about being fired from SUNO. He went over to her house about three times per week to check on her during that time, and she was usually still in her night clothes, with the house dark. Mr. Hilliard corroborated Mr. Williams' testimony that Ms. Brooks cried a lot and was short-tempered with her kids. Mr. Hilliard suggested that Ms. Brooks apply to the Orleans Parish School Board, but she found middle school hard to adjust to. She felt she had been demoted, and she was upset because she could not coach. The witness helped her financially, and she had to use part of her Las Vegas retirement plan funds. Mr. Hilliard testified that at the time of trial, Ms. Brooks was better mentally than she had been in 1997-1998, but she still felt a void in her life.
*1227 The final witness relating to the issue of damages was Dr. David Dunn, who testified that he had been Ms. Brooks' obstetrician/gynecologist since 1994. He testified that around 1998, Ms. Brooks became withdrawn, less vocal, less animated, and smiled less. Dr. Dunn testified that although he was not a psychiatrist, he recognized these as the signs of depression. He also noted that the plaintiff had hair loss and a loss of twenty to thirty pounds in 1999. However, her symptoms were never severe enough for him to recommend a psychiatrist or to prescribe medicine. On cross-examination, Dr. Dunn admitted that in 1995, he had prescribed weight loss medication for Ms. Brooks because she wanted to lose weight. He also admitted that he had not documented any change in Ms. Brooks' demeanor in his records from 1998 and 1999.
SUNO did not call any witnesses on the issue of damages.

C. Discussion of the law and its application to the evidence
In view of the evidence, we cannot say the trial court erred by granting the JNOV as to damages. No reasonable jury could have awarded $475,000 as compensation for Ms. Brooks' mental / emotional injuries, especially since her depression was never severe enough to require professional help. We agree with the trial court that the most likely explanation for the inordinate sum is that the jury failed to adhere to the instructions regarding compensatory versus punitive damages. We therefore find the entering of a JNOV was appropriate.
We, however, find that the trial court's award of $65,000 is manifestly erroneous in view of the record because that amount is unreasonably low under the circumstances of this case. According to the appellate standard of review, we are constrained to raising the trial court's award only to the lowest point that would be reasonable in light of the evidence. See Coco v. Winston Industries, supra.
Because of Coach Hill's harassment and the loss of her job at SUNO, Ms. Brooks suffered anxiety, depression, humiliation, short-term financial distress, and a year-long diminution in her standard of living. She also lost her dream of coaching at the college level, although it is impossible to say if she would have ultimately been successful as a coach at SUNO in the absence of Earl Hill's offensive behavior. In light of the evidence, we find that $200,000 is the lowest amount of general damages that is reasonably supported by the record. Therefore, we amend the trial court's judgment to award the sum of $200,000 in general damages.

ATTORNEY FEES AND COSTS
The plaintiff appeals the trial court's judgment awarding her $29,200 in attorney fees, and SUNO appeals the award of $6,033.38 in costs. Ms. Brooks is entitled to reasonable attorney fees and costs under La. R.S. 23:303 A and La. R.S. 51:2264. The issue, in both respects, is whether the trial court abused its discretion in determining what amount is reasonable.
Regarding attorney fees, the plaintiff argues that the trial court abused its discretion by ignoring the evidence as to the hours expended and the hourly rates, and instead assigning a percentage (40%) of the overall damage award. The plaintiff presented evidence showing that approximately 500 attorney hours (459 at a rate of $250 per hour and the remainder at $150 per hour) and 27 paralegal hours (at $55 per hour) were spent on the instant case, including the taking of thirteen depositions, defense of various motions, the eight-day trial, and post-trial motions. Using the Lodestar method of calculation, the plaintiff estimated attorney fees of *1228 $122,771. The plaintiff argues on appeal that the trial court abused its discretion by declining to use the Lodestar method, which is routinely utilized in discrimination cases in federal court. Although the Lodestar method has been employed in at least one Louisiana sexual harassment case, the amount of attorney fees awarded in that case did not exceed the amount of compensatory damages. (See Hanley v. Doctor's Hospital of Shreveport, 35,527 (La.App. 2 Cir. 6/6/02), 821 So.2d 508, in which the appellate court awarded $124,130 in attorney fees, $180,000 in compensatory damages and $100,000 in punitive damages).
As we stated in Alphonse v. Omni Hotels Management Corp., supra, the amount of attorney fees and costs to be awarded is within the sound discretion of the trial court. Among the factors to be considered by the appellate court in determining whether an attorney fee award is an abuse of discretion are: (1) the ultimate result obtained; (2) the amount of money involved; (3) the extent and character of the work performed; (4) the legal knowledge, attainment and skill of the attorney; and (5) the number of appearances made. Id. at p. 5, 643 So.2d at 841. The trial court in the instant case correctly considered the ultimate result obtained in determining the amount of attorney fees. We therefore conclude that the trial court did not abuse its discretion by awarding as attorney fees a percentage (40%) of the total amount of damages. However, in light of our raising of the general damage award from $65,000 to 200,000 (which raises the total compensatory damage award from $73,000 to $208,000), we find the original attorney fee award of $29,200 is an abuse of discretion. We therefore amend the trial court's judgment to award $83,200 in attorney fees, which is forty percent (40%) of $208,000.
Finally, we conclude that SUNO has not demonstrated that the trial court abused its discretion in awarding costs. We therefore decline to disturb that award.

CONCLUSION
For the reasons stated, we amend the first April 10, 2002, judgment of the trial court to award $200,000 in general damages, and we amend the second April 10, 2002, judgment to award $83,200 in attorney fees. In all other respects, those judgments are affirmed.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] The errors cited were: 1) Two defendants were sued (Southern University and Agricultural and Mechanical College and the Board of Supervisors of Southern University, but only the first defendant was cast in judgment); 2) The judgment neglected to award any amount for attorney fees, although such was prayed for and is allowed by statute; and 3) The judgment omitted the $8,000 awarded for loss of income.
[2] According to the record, the motion was heard and denied in the trial judge's chambers.
[3] The provisions of Article 404(B) are generally applicable to civil as well as criminal cases. PUGH, FORCE, RAULT & TRICHE, HANDBOOK ON LOUISIANA EVIDENCE LAW 322 (2000).
[4] These were essentially the same incidents she later testified to at trial, discussed earlier in this opinion.
[5] On April 20, 1998, Ms. Brooks also filed a formal discrimination charge in the New Orleans district office of the EEOC. The status of this complaint is unknown.
[6] The committee referred to was the Academic Responsibilities, Rights and Ethics Committee, known as ARREC.
[7] This program was one of the non-retaliatory reasons given by SUNO for the non-renewal of the plaintiff's teaching contract. See discussion of evidence presented by SUNO, infra.
[8] This letter is what has been referred to previously as Ms. Brooks' second complaint.
[9] Dr. Peoples acknowleged that the letter was stamped as having been received in his office on March 2, 1998. He insisted, however, that he must have received a letter or some other communication concerning Dr. Harris' recommendation before he decided to terminate Ms. Brooks, although he could not produce any such correspondence.
[10] However, later in Dr. People's testimony he indicated he thought Ms. Brooks had withdrawn her sexual harassment claim and was asserting only gender discrimination at this point in time.
[11] In view of this conclusion, we need not address the jury's findings with regard to gender discrimination. In addition, our affirmation of the jury's finding of retaliation pretermits consideration of the issue of whether SUNO knew or should have known of the sexual harassment for the purpose of imposing liability upon SUNO for Earl Hill's actions under the principle of respondeat superior.